## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MSTM, LLC and M&M MASS SPEC CONSULTING, LLC, <br><br> Plaintiffs, <br><br> v. <br><br> WATERS CORPORATION, <br><br> Defendant. | Civil Action No. _____ |

## COMPLAINT

Plaintiffs MSTM, LLC ("MSTM") and M&M Mass Spec Consulting, LLC ("M&M") (collectively, "Plaintiffs"), for their Complaint against Defendant Waters Corporation ("Waters" or "Defendant") hereby allege, on knowledge as to their own actions, and upon information and belief as to all other matters, as follows:

## INTRODUCTION

1.      This is a civil action for the infringement of U.S. Patent Nos. 7,977,629 ("the '629 Patent"), 9,105,458 ("the '458 Patent"), 10,679,838 ("the '838 Patent"), 11,430,648 (the '648 Patent"), 9,870,909 ("the '909 Patent"), 9,552,973 ("the '973 Patent"), 10,128,096 ("the '096 Patent"), and 10,796,894 ("the '894 Patent") (collectively, the "Patents-in-Suit") pursuant to the Patent Laws of the United States, 35 U.S.C. § 100, *et seq*., including §§ 271(a), 271(b), and/or 271(c).

2.      The Patents-in-Suit — all of which are either owned by or exclusively licensed to Plaintiffs — relate to mass spectrometry. Mass spectrometry is an analytical technique that, *inter alia*, identifies and quantifies one or more compounds and components within a sample, and also traces of components at minute concentrations.  Mass spectrometry technology has emerged as

one of the key technologies used in various analytical applications, such as drug development procedures, proteomics, metabolomics, chemical and forensic analyses, and pharmaceutical analysis.

3.     Plaintiff M&M was co-founded by Charles McEwen, Ph.D. in July 2006 together with Richard McKay, Ph.D. M&M was built on the principle of bringing needed mass spectrometry technology to market at a fair and competitive price.

4.     Plaintiff MSTM was founded by Charles McEwen, Ph.D. and Sarah Trimpin, Ph.D. in November 2013. MSTM is a National Science Foundation ("NSF") recognized and awarded company in the field of mass spectrometry.

5.     Drs. McEwen and Trimpin have been innovative leaders in developing novel ionization technologies for mass spectrometry.

6.     Dr. McEwen is the President of MSTM. Dr. McEwen is also the Houghton Professor of Chemistry & Biochemistry at the University of the Sciences ("USciences") in Philadelphia, which merged with Saint Joseph's University ("SJU") in 2022.  Dr. McEwen received his doctorate from the University of Virginia, a Master of Science degree from Atlanta University, and a Bachelor of Science degree from the College of William and Mary.  Dr. McEwen is well-known for inventing the Atmospheric Solids Analysis Probe (ASAP) devices and methods, which have been used extensively in mass spectrometry.  Dr. McEwen was awarded the DuPont Peterson award in connection with his innovative contributions in the field of mass spectrometry. Dr. McEwen is the inventor of numerous patents related to mass spectrometry.  Dr. McEwen has edited and co-authored books and chapters of books and has over 100 peer-reviewed publications in mass spectrometry.

2

7.      Dr. Trimpin is the Chief Executive Officer of MSTM. Dr. Trimpin is also a tenured Professor in the Department of Chemistry at Wayne State University ("Wayne State") in Detroit, Michigan.  Dr. Trimpin received her Doktor der Naturwissenschaften (Doctor of Science) from the Max-Planck-Institute for Polymer Research, and Diplom Chemie and Baccalaureate from Universität Konstanz.  Among many awards, Dr. Trimpin has been awarded the American Society for Mass Spectrometry ("ASMS") Biemann Medal for development of novel ionization processes for mass spectrometry.  The Biemann Medal was established in honor of Professor Klaus Biemann and is presented annually to recognize the achievements of an academic scientist in mass spectrometry early in one's career.

8.      Dr. Trimpin has also received the NSF CAREER award, the American Society for Mass Spectrometry Young Investigator Award, the Pittsburgh Conference Achievement Award, the DuPont Young Professor Award, the Eli Lilly Young Investigator in Analytical Chemistry award, and the Wayne State Schaap Faculty Scholar Award for Excellence in Teaching and Research.  In addition, Dr. Trimpin received the Wayne State Board of Governors' Faculty Recognition award.  Dr. Trimpin has authored over 80 publications, co-authored books, and is an inventor of over 11 patents related to mass spectrometry.

9.      Drs. McEwen's and Trimpin's ionization methods and technologies are well-recognized in the field of mass spectrometry.  Many mass spectrometry companies, including Waters, have sought out Drs. Trimpin and McEwen for their innovative know-how and technology in the area of mass spectrometry.

10.     For many years, Waters has repeatedly praised the novel ionization technologies for mass spectrometry embodied in the Patents-in-Suit.  For many years, Waters has expressed considerable interest in the ionization technologies discovered by Drs. McEwen and Trimpin.

11.   Waters has executed various non-disclosure agreements (NDAs) with MSTM and Drs. McEwen and Trimpin in order for Waters to assess its interest in licensing MSTM's Patents-in-Suit. However, Waters has declined to license MSTM's Patents-in-Suit.

12.   Without a license or authorization, Waters is manufacturing, using, offering to sell, selling within, and/or importing into the United States mass spectrometry devices and products that infringe the Patents-in-Suit.

13.   Plaintiffs bring this action for patent infringement to protect their rights and investment in their innovations embodied in the Patents-in-Suit infringed by Waters.

14.   Waters' past and continuing sales of its mass spectrometry products (i) willfully infringe the Patents-in-Suit and (ii) impermissibly take the significant benefit of Plaintiffs' patented technologies without compensation to Plaintiffs.

15.   Waters' decision to not obtain a license to MSTM's Patents-in-Suit has forced MSTM to seek remediation to stop Waters' continuing willful infringement of MSTM's Patents-in-Suit and to be compensated for Waters' past willful infringement of MSTM's Patents-in-Suit.

16.   M&M asserts a claim for breach of contract because Waters has withheld considerable royalties from substantial amounts of sales of Waters' mass spectrometry products, which constitutes a breach of a non-exclusive license agreement for the '629 Patent.  In addition, M&M asserts a claim for breach of an implied covenant of good faith and fair dealing against Waters.

## THE PARTIES

17.   Plaintiff MSTM is a Delaware limited liability company with its principal place of business at 28 Tenby Chase Drive, Newark, Delaware 19711.

18.   Plaintiff M&M is a Delaware limited liability company with its principal place of business at 32583 Woods Court, Harbeson, Delaware 19951.

4

19.     Defendant Waters Corporation is a corporation organized under the laws of the State of Delaware with a principal place of business and corporate headquarters located at 34 Maple Street, Milford, Massachusetts, 01757. Waters is registered to conduct business in the state of Massachusetts.

## JURISDICTION AND VENUE

20.     This action arises under the patent laws of the United States, 35 U.S.C. § 100, *et seq.*, including §§ 271(a), 271(b), and/or 271(c).

21.     This Court has subject matter jurisdiction over the matters asserted herein pursuant to 28 U.S.C. §§ 1331 and 1338(a).

22.     This Court has personal jurisdiction over Waters because Waters has a principal place of business in Massachusetts and is registered to conduct business in Massachusetts.  Waters' principal executive offices are located at 34 Maple Street, Milford, Massachusetts 01757.

23.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(a), 1391(c), and 1400(b) because Waters has a principal place of business and engages in infringing activities in this District.  Waters regularly conducts business in this District and is subject to personal jurisdiction in this District.

24.     This Court also has subject matter jurisdiction, pursuant to 28 U.S.C. § 1338(b), over the breach of contract and breach of an implied covenant of good faith and fair dealing claims because such claims involve, and are substantially related to, the Patent Laws of the United States, 35 U.S.C. § 1, *et seq*, and federal question jurisdiction under 28 U.S.C. § 1331.  In addition, the breach of contract and breach of an implied covenant of good faith and fair dealing claims form a part of the same case and controversy making the exercise of supplemental jurisdiction under 28 U.S.C. § 1367(a) appropriate.  In addition, pursuant to 28 U.S.C. § 1332(a)(1) the Court has jurisdiction over the breach of contract and implied covenant of good faith and fair dealing claims

because the amount of controversy exceeds $75,000 and diversity of citizenship exists between Plaintiffs and Waters.

## THE PATENTS-IN-SUIT

25.     On July 12, 2011, the United States Patent and Trademark Office ("USPTO") duly and legally issued the '629 Patent, titled "Atmospheric Pressure Ion Source Probe for a Mass Spectrometer," to inventors Charles Nehemiah McEwen and Richard Garrett McKay.  A true and correct copy of the '629 Patent is attached as Exhibit A.  Plaintiff M&M is the owner and assignee of all legal title in the '629 Patent and holds the right to sue and recover damages for infringement, including ongoing and past infringement.

26.     On August 11, 2015, the USPTO duly and legally issued the '458 Patent, titled "System and Methods for Ionizing Compounds Using Matrix-Assistance for Mass Spectrometry and Ion Mobility Spectrometry," to inventors Sarah Trimpin and Ellen dela Victoria Inutan.  A true and correct copy of the '458 Patent is attached as Exhibit B. Plaintiff MSTM is the owner and assignee of all legal title in the '458 Patent and holds the right to sue and recover damages for infringement, including ongoing and past infringement.

27.     On June 9, 2020, the USPTO duly and legally issued the '838 Patent, titled "System and Methods for Ionizing Compounds Using Matrix-Assistance for Mass Spectrometry and Ion Mobility Spectrometry," to inventors Sarah Trimpin and Ellen dela Victoria Inutan.  A true and correct copy of the '838 Patent is attached as Exhibit C.  Plaintiff MSTM is the owner and assignee of all legal title in the '838 Patent and holds the right to sue and recover damages for infringement, thereof, including ongoing and past infringement.

28.     On August 30, 2022, the USPTO duly and legally issued the '648 Patent, titled "System and Methods for Ionizing Compounds Using Matrix-Assistance for Mass Spectrometry and Ion Mobility Spectrometry," to inventors Sarah Trimpin and Ellen dela Victoria Inutan.  A

true and correct copy of the '648 Patent is attached as Exhibit D. Plaintiff MSTM is the owner and assignee of all legal title in the '648 Patent and holds the right to sue and recover damages for infringement, including ongoing and past infringement.

29.    On January 16, 2018, the USPTO duly and legally issued the '648 Patent, titled "Compositions and Methods for Mass Spectrometry," to inventor Sarah Trimpin. A true and correct copy of the '909 Patent is attached as Exhibit E. Plaintiff MSTM is the owner and assignee of all legal title in the '909 Patent and holds the right to sue and recover damages for infringement, including ongoing and past infringement.

30.    On January 24, 2017, the USPTO duly and legally issued the '973 Patent, titled "System and Method for Ionization of Molecules for Mass Spectrometry and Ion Mobility Spectrometry," to inventors Charles Nehemiah McEwen, Sarah Trimpin, and Vincent Salvatore Pagnotti. A true and correct copy of the '973 Patent is attached as Exhibit F. The '973 Patent has been assigned to USciences and Wayne State, collectively, the "Universities." The Universities granted MSTM an exclusive (worldwide) license having all substantial rights to the '973 Patent. A true and correct copy of MSTM's exclusive (worldwide) license agreement is attached as Exhibit G.

31.    On November 13, 2018, the USPTO duly and legally issued the '096 Patent, titled "System and Method for Ionization of Molecules for Mass Spectrometry and Ion Mobility Spectrometry," to inventors Charles Nehemiah McEwen, Sarah Trimpin, and Vincent Salvatore Pagnotti. A true and correct copy of the '096 Patent is attached as Exhibit H. The '096 Patent has been assigned to the Universities. The Universities granted MSTM an exclusive (worldwide) license having all substantial rights to the '096 Patent. *See* Ex. G.

32.     On October 6, 2020, the USPTO duly and legally issued the '894 Patent, titled "System and Method for Ionization of Molecules for Mass Spectrometry and Ion Mobility Spectrometry," to inventors Charles Nehemiah McEwen, Sarah Trimpin, and Vincent Salvatore Pagnotti. A true and correct copy of the '894 Patent is attached as Exhibit I.  The '894 Patent has been assigned to the Universities.  The Universities granted MSTM an exclusive (worldwide) license having all substantial rights to the '894 Patent. *See* Ex. G.

33.     Pursuant to its exclusive (worldwide) license agreement for the '973, '096, and '894 Patents (collectively, the "Licensed Patents"), MSTM has the sole right to elect to pursue any resolution of any alleged infringement or unauthorized use of the Licensed Patents.  On December 12, 2022, and January 13, 2023, respectively, USciences and Wayne State acknowledged and consented to MSTM exercising its sole and exclusive right to assert the Licensed Patents against Waters.  As the exclusive (worldwide) licensee, MSTM holds the sole right to sue and recover damages for infringement of the Licensed Patents, including ongoing and past infringement.

## THE PLAINTIFFS' INNOVATIVE IONIZATION TECHNOLOGIES

### M&M's ASAP Probe Patented Technology

34.     Dr. McEwen coinvented the groundbreaking technology known as the Atmospheric Solids Analysis Probe ("ASAP" or "ASAP Probe") that is embodied in the '629 Patent.

35.     Dr. McEwen founded M&M with his co-inventor, Dr. Richard McKay. M&M markets and sells the ASAP Probe technology. MSTM is a distributor of the ASAP Probe.

36.     Since 2011, M&M and MSTM have marked the ASAP Probes notifying the public of the patented technology embodied their products.

37.     The '629 Patent, titled "Atmospheric Pressure Ion Source Probe for a Mass Spectrometer," claims, *inter alia*, an ion source that has the ability to ionize compounds from both liquid and solid sources, which facilitates ionization of volatile and semivolatile compounds by

applying heat from a gas stream as well as highly nonvolatile compounds infused by electrospray or separated by liquid chromatography or capillary electrophoresis. The '629 Patent issued on July 12, 2011 from U.S. Patent Application No. 12/231,524 filed on September 8, 2008 and Provisional Application No. 60/975,385 filed on September 26, 2007.

38.    On June 1, 2008, Mircomass Ltd UK ("Mircomass"), a wholly-owned subsidiary of Waters, obtained a non-exclusive license to the '629 Patent (the "ASAP Agreement"), which is attached hereto as Exhibit J.

39.    As recognized by Waters, "a low cost alternative, the Atmospheric Pressure Solids Analysis Probe (ASAP), introduced by McEwen *et al.*, has [] been shown to be a useful tool for the rapid direct analysis of volatile and semi-volatile solid and liquid samples using atmospheric pressure ionization." *See* www.waters.com/webassets/cms/library/docs/720002742en.pdf.

40.    According to Waters, "the ASAP is readily fitted to an atmospheric pressure ionization (API) source by the simple replacement of either the ESI or APCI probe and the fitting of a corona discharge pin." *See id*.

41.    For many years, Waters has praised M&M's ASAP Probe patented technology.

42.    On November 20, 2013, Waters submitted a letter that served as a formal recognition and continued support for the NSF STTR proposal "Inlet Ionization Commercialization for Mass Spectrometers" submitted by Drs. Trimpin and McEwen (the "Waters 2013 NSF Letter").

43.    With respect to the ASAP Probe, the 2013 Waters NSF Letter states:

The ASAP is an optional accessory for [Waters'] mass spectrometers. It is used in all industries where Waters engages: food, pharmaceuticals, fine chemicals, environmental among others and has become the single best selling accessory in Waters history.

44.     On November 22, 2013, letter, Waters wrote a letter to the ASMS in recognition of Dr. Charles McEwen (the "McEwen Recognition Letter").

45.     Waters' McEwen Recognition Letter states that it serves as a formal recognition of the scientific accomplishments of Dr. McEwen in the fields of academic advancement, fundamental scientific research, and commercial advancement.

46.     Waters' McEwen Recognition Letter further states that Waters, a leader in the field of separations and mass spectrometry, is always in search of innovation, and their relationship with Dr. McEwen has been instrumental in the release of a number of such innovations, including the Atmospheric Solids Analysis Probe (ASAP).

47.     In the McEwen Recognition Letter, Waters further states that the ASAP Probe is a product option to Waters' mass spectrometers that takes advantage of the accurate mass capabilities of the modern mass spectrometer operating at atmospheric pressure rather than vacuum, and that this ASAP Probe product enables a customer to get accurate mass information in real time for a broad range of samples, such as food, pharmaceuticals, bodily fluids, and fine chemicals.

48.     In the McEwen Recognition Letter, Waters states that, to date, Waters has sold more of McEwen's ASAP probes than any other single accessory for mass spectrometry.  The McEwen Recognition Letter also states that Waters reviews all of the technological investments it makes as a company and in deciding which to pursue, takes into account two factors: (1) the innovation as applied to an unmet need of its customer and (2) the historical reputation of the scientist-inventor; and the latter requirement is as important as the former since finding a highly credible scientist is fundamental to the eventual success of an innovation.

49.     In the McEwen Recognition Letter, Waters further writes that Dr. McEwen is rated near the top of credible scientist-inventors and recipient of the highest respect within Waters. Waters concludes by stating that it believes recognition of Dr. McEwen by the ASMS is well justified, and thanks the ASMS for the opportunity to present information about Dr. McEwen.

50.     For many years, Waters has promoted and marketed, and continues to promote and market, the M&M's ASAP Probe patented technology, including marketing M&M's ASAP Probe patented technology on its website worldwide.

51.     For many years, Waters has promoted and marketed, and continues to promote and market, M&M's ASAP Probe patented technology as a direct analysis device compatible with Waters' mass spectrometry devices, such as the line of SQ Detector 2 products.

52.     A Waters' product solution brochure states:

The Waters Atmospheric Solid Analysis Probe (ASAP),[1*] has proven to be a useful tool in the direct analysis of a wide range of samples . . . In seconds Waters ASAP can replace the ESI or APCI probe in the source housing of Waters mass spectrometry products, including the range of analysis possible on a particular instrument. . . . ASAP is compatible with a full range of Waters MS products, including ToF/QTof and triple quadrupole instruments including, SYNAPT® G2 HDMS, Xevo™ G2 QTof, Xevo QTof, SQD, TQD, Xevo TQ and Xevo TQ-S. . . . *Waters ASAP has been developed under a license [with Plaintiff] M&M Mass Spec Consulting LLC.

53.     In 2020, Waters introduced its RADIAN (Rapid Direct Analysis) ASAP System to the market. Waters purports that the RADIAN ASAP is a novel direct mass detector engineered for non-mass spectrometry experts to conduct fast and accurate analyses of solids and liquids with minimal sample prep.  The RADIAN ASAP is a standalone system that solely uses the ASAP technology embodied in the '629 Patent.

54.     In a webinar titled "Bringing Ambient Ionization to a Wider Audience," Ed Sprake, Principal Product Manager for Mass Spectrometry at Waters, admits that Waters incorporated Dr.

McEwen's ASAP Probe technology into the RADIAN ASAP mass spectrometer. *See* https://youtu.be/AViDyi0Qp0I.

55.     In promoting the RADIAN ASAP mass spectrometry technology, Waters states the following:

> **ASAP ionization itself was developed by Chuck McEwen and his group in about 2005**. And it's really enjoyed widespread use on multiple vendors and types of mass spec technology, including our own universal ion source. So **for the RADIAN instrument**, **[Waters] redesigned the ASAP source** to incorporate horizontal sample loader, which not only make it simpler to use but it also fits better with typical sampling and analysis workflows.

*See id.*, at 7:58 (emphasis added).

56.     In its publication, "Demonstrating the Waters RADIAN Direct Ionization Detector As a Rapid Screening Tool for Discovery Reaction Monitoring," Waters states that "combining a proven and robust single quadrupole detector with well-established ASAP direct sample analysis allows medical chemists with a diverse range of analytical expertise to rapidly access nominal mass data during drug synthesis reactions."  *See* www.waters.com/webassets/cms /library/docs/720007111en.pdf (citing McEwen *et al.*, "Analysis of Solids, liquids, and Biological Tissues Using Solids Probe Introduction at Atmospheric Pressure on Commercial LC-MS Instruments," *Anal Chem*, 2005, 77, 7826-7831.).

57.     For many years, the ASAP Probe has been and continues to be the single best-selling accessory in Waters' history.

58.     For many years, Waters has benefited and continued to benefit from substantial worldwide sales of mass spectrometer products that incorporate the ASAP Probe patented technology.

**MSTM's Patented Ionization Technologies For Mass Spectrometry**

59.     MSTM is a small business that has been supported by NSF's Phase, I, II, and Technology Enhancement for Commercial Partnership ("TECP") awards to commercialize the company's advanced mass spectrometry ionization techniques.

60.     The NSF's Small Business Innovation Research (SBIR) / Small Business Technology Transfer (STTR) programs offer a TECP supplemental funding opportunity to all active NSF SBIR/STTR Phase II awardees, like MSTM.  The TECP program is intended to help small businesses, like MSTM, successfully commercialize their technologies.

61.     Drs. McEwen and Trimpin co-invented the groundbreaking and nationally awarded mass spectrometry technologies embodied in the '973, '096, and '894 Patents.

62.     The inventions claimed in the '973, '096, and '894 Patents were recognized by the NSF with National Science Foundation Career Award.

63.     The '973, '096, and '894 Patents relate to, *inter alia*, ionizing systems that include a channel having an inlet disposed in a first pressure region and an outlet disposed in a second pressure region, a pressure of the first pressure region being greater than a pressure of the second pressure region; a heater is coupled to the channel and configured to heat the channel; and a device is configured to introduce an analyte into the channel where the analyte is ionized.

64.     In addition, the '973, '096, and '894 Patents relate to, *inter alia*, ionizing methods that include creating a pressure differential across a channel having a first end disposed in a first pressure and a second disposed in a second pressure, with or without heating the channel, receiving an analyte in the channel, and ionizing the analyte in the channel.

65.     As the CEO and co-founder of MSTM, Dr. Trimpin also invented the groundbreaking, innovative, and well-regarded mass spectrometry technologies embodied in the '458, '898, '648, and '909 Patents.

13

66.     The '458, '898 and '648 Patents relate to, *inter alia*, systems and methods for producing ions, singly or multiply charged, and analyzing compounds of widely varying molecular weights including small molecules, as well as macromolecules using matrices and vacuum and referred to as matrix assisted ionization vacuum.

67.     For the discovery, implementation, and utility of, particularly, vacuum matrix-assisted ionization embodied in the '458, '898, and '648 Patents, Dr. Trimpin was awarded the ASMS Biemann Medal in June 2019.

68.     The '909 Patent relates to, *inter alia*, mass spectrometry and ion mobility spectrometry and more particularly to ionizing matrices facilitating transfer of analyte compounds from solid or solution states into gas-phase ions when the ionizing matrix is associated with an analyte and subjected to conditions in which the ionizing matrix sublimes or evaporates. The '909 Patent is based, in part, on the discovery of certain matrix compounds to produce analyte ions when a mixture of the matrix compound and the analyte is exposed to vacuum conditions without the need to apply high voltage or a laser.

69.     Since 2010, Waters has encouraged Dr. Trimpin, Dr. McEwen, and MSTM to execute NDAs in order for Waters to assess its interest in licensing their patents.

70.     Since 2010, Waters has recognized the commercial benefit of utilizing and incorporating MSTM's patented technologies in Waters' mass spectrometry instrumentations and devices.

71.     On July 14, 2010, Waters executed an NDA with Wayne State ("2010 Wayne State NDA"), under which Dr. Trimpin disclosed confidential information related to laserspray inlet ionization, including other information regarded as confidential and proprietary information.

72.     Under the 2010 Wayne State NDA, as the receiving party, Waters' purpose of using confidential information was limited to assessing Waters' interest in licensing and commercial development of Dr. Trimpin's confidential information.

73.     Pursuant to the 2010 Wayne State NDA, if any confidential information is or became the subject of a patent application or patent made or received by Wayne State under the laws of the United States or any foreign jurisdiction, Wayne State shall have all the rights and remedies available to it as a result of said patent application or patent.

74.     In a January 12, 2011, letter to Dr. Trimpin, Mr. Ronan O'Malley, Senior Product Manager at Waters, wrote the following:

> My purpose for writing is to provide a letter of support on behalf of the Waters Corporation for your development efforts in the field of mass spectrometry ionization processes. Waters has followed your LaserSpray ionization and related matrix assisted ionization development efforts with great interest and we believe this technology may have significant applicability for the analysis of challenging biomolecule and chemical materials.

75.     In the January 12, 2011 letter, Waters further writes that a number of Dr. Trimpin's early development proof statements were produced on Waters' mass spectrometry instrumentations, and Waters sees value in achieving a more complete understanding of the potential of this technology when enabled on its instrumentation.

76.     On or about August 17, 2011, Dr. Trimpin provided Waters with confidential information concerning inlet ionization innovations for mass spectrometry and unpublished patent applications related thereto.

77.     Dr. Trimpin provided Waters with a copy of her non-published patent application titled "Systems and Methods for Ionization of Molecules for Mass Spectrometry and Ion Mobility Spectrometry."

78.     In a September 9, 2011 email to Dr. Trimpin, which attached Waters' Center for Innovation Program Letter of Understanding ("COI Letter of Understanding"), Mr. Tim Riley, Vice President of Waters, states that Waters is interested in loaning Dr. Trimpin a Synapt G2 in support of her research and there are ongoing discussions regarding the potential licensing of some of Dr. Trimpin's intellectual property.  In that same September 9, 2011 email, Mr. Riley further states that the parties are in agreement that they need to progress both of these items, but Waters feels that it is appropriate to keep the discussion on both of these items separate from the Centers of Innovation Partnership discussion.

79.     On October 1, 2011, Waters provided Dr. Trimpin with a letter invitation to be a participant in Waters' Center of Innovation program and the purpose of the COI Letter of Understanding was to clarify the roles and responsibilities of each party as they relate to the Waters Centers of Innovation Program.

80.     Dr. Trimpin was Waters' first of only 33 Center of Innovation members.

81.     With respect to confidential information, Waters' COI Letter of Understanding provided to Dr. Trimpin states that each party agrees not to (i) disclose the other's Confidential Information to any third party and (ii) use the other's Confidential Information for any purpose other than as contemplated by this letter.

82.     With respect to confidential information, Waters' COI Letter of Understanding states:

> All written data delivered by the disclosing party pursuant to this agreement shall be and remain the property of the disclosing party, and no license or conveyance of any rights to either party under any discoveries, inventions, patents, trade secrets, copyrights, or other form of intellectual property is granted or implied by the exchange of Confidential Information between the parties.
>
> This agreement shall not constitute, create, give effect to or otherwise imply a joint venture, pooling arrangement, partnership or formal business organization of any kind, nor shall it constitute, create, give effect to, or otherwise imply an obligation

or commitment on the part of either party to submit a proposal to or perform a contract with the other party.

83.    With respect to confidential information, Waters' COI Letter of Understanding states that the confidentiality obligations of this letter shall survive the expiration or termination of this letter.

84.    On November 1, 2011, Waters executed a mutual confidential non-disclosure agreement with the USciences ("2011 USciences NDA") for the purpose of evaluating the potential for a sponsored research program with Dr. McEwen's mass spectrometry research laboratory at USciences.

85.    Under the 2011 USciences NDA, Dr. McEwen disclosed propriety information related to solvent assisted inlet ionization, matrix assisted inlet ionization, and laserspray inlet ionization, including unpublished patent applications related to the same.

86.    Working under the USciences NDA, Dr. McEwen provided Waters with a copy of the unpublished patent application for System and Methods For Ionization of Molecules for Mass Spectrometry and Ion Mobility.

87.    Under the 2011 USciences NDA, the disclosure of confidential information shall not constitute any grant, option, or license to Waters under any patent or other intellectual property rights held by USciences.

88.    Under the 2011 USciences NDA, Dr. McEwen provided Waters with confidential information and an unpublished patent application covering Systems and Methods for Ionization of Molecules for Mass Spectrometry and Ion Mobility Spectrometry.

89.    Under the 2011 USciences NDA, if USciences employs attorneys to enforce any rights arising out of or relating to NDA, USciences, as the prevailing party, shall be entitled to recover its costs, including reasonable attorneys' fees.

17

90.     USciences owns seven percent (7%) of MSTM. MSTM's patent infringement action arises out of or relates to the 2011 USciences NDA, and, as the prevailing party, MSTM is entitled to recover its costs, including reasonable attorneys' fees, pursuant to the 2011 USciences NDA.

91.     Waters also entered into an NDA agreement with MSTM so that Waters can assess its interest in licensing MSTM's patents.

92.     Working under an NDA, Waters obtained a copy of the unpublished patent application for System and Methods for Ionizing Compounds Using Matrix-Assistance for Mass Spectrometry and Ion Mobility Spectrometry.

93.     Working under an NDA, Waters obtained a copy of the unpublished patent application for Compositions and Methods for Mass Spectrometry.

94.     From 2011 to 2022, Waters has praised Drs. McEwen's, Trimpin's and MSTM's patents and innovations related to ionization technologies in mass spectrometry.

95.     From 2011 to 2022, Waters has expressed its interest in the innovation of the new ionization technologies discovered by Drs. McEwen and Trimpin, which are embodied in the Patents-in-Suit.

96.     Regarding the inventions embodied in the '973, '096, and '894 Patents, in an August 2011 email, Martin Green (Consultant Research Scientist, Waters), together with Mike Morris (Director of Mass Spectrometry Research, Waters), Ronan O'Malley (Senior Manager Mass Spectrometry Product Management, Waters), Tim Riley (Vice President and Managing Director, Waters) and Jeff Brown (Senior Research Scientist, Waters) wrote to Dr. McEwen stating:

> Further to our brief discussion last week, we have not yet been able to get hold of a copy of the IP that Mike Morris (Waters) has a copy of.  Obviously, obtaining a

18

license to pursue these inlet ionization techniques underpins our interest in the research interactions. Please find attached a loose draft proposal for a potential collaboration agreement. I would be grateful if you could look this over, and I would welcome your input as to how Dr. Trimpin (and, thus, Wayne State) might need to be included.

97.    In a September 14, 2011, email, Michael Balogh (Director, Strategic Collaborations, Waters) wrote to Dr. McEwen stating:

> I have an agreement being worked on (really two - a separate one that focuses solely on making sure Waters is clear on access to Wayne State's IP). The agreement should acknowledge all existing background IP and specify foreground developments that may come as a result of us working together - this could be SAII (Solvent Assisted Inlet Ionization) etc. but also the ASAP improvement program. Aside from the SAII (Solvent Assisted Inlet Ionization) development needed, leading to a license, I would be happy to hand over drawings and ideas on the ASAP front and have you and your people craft things and run studies to show us what and where to improve both the TD ramp software I mentioned (probably as a MatLab at first) and the hot probe device.

98.    Regarding the inventions embodied in the '973, '096, and '894 Patents, in a September 14, 2011, email, Michael Balogh (Director, Strategic Collaborations, Waters) wrote to Dr. McEwen stating:

> Since Waters only wants to make sure we are not left out - you and the students do the necessary further development on SAII (solvent assisted inlet ionization) which helps Waters get to its goal of commercializing in some form. All commitments however come through Wayne State. The "no strings attached" work is done to the benefit of all in your lab.

99.    From 2011 to 2012, Waters' executives and employees, such as, Mike Morris (Director of Mass Spectrometry Research, Waters), Martin Green (Consultant Research Scientist, Waters), Ronan O'Malley (Senior Manager Mass Spectrometry Product Management, Waters), Tim Riley (Vice President and Managing Director, Waters), and Kieran Neeson (Senior Software Engineer, Waters) visited Drs. McEwen's and/or Trimpin's laboratories to observe and obtain information about Drs. McEwen's and Trimpin's innovative ionization technologies on mass spectrometry devices. The purpose of Waters' multiple visits to Drs. McEwen's and Trimpin's

laboratories was to assess Waters' interest in obtaining a license to the technologies embodied in the '973, '096, '894, and '458 Patents.

100.    In the Waters 2013 NSF Letter, Waters praises Drs. McEwen and Trimpin's inlet ionization technologies embodied in the '973, '096 and '894 Patents, and expresses interest in the patented technology.

101.    With respect to MSTM's inlet ionization technology, the Waters 2013 NSF Letter states that the utility of the MSTM's new ionization methodology using the ion mobility technology for Waters' SYNAPT series of instrument has been demonstrated, and Waters sees a bright future for this technology.

102.    On July 13, 2015, Waters provided another letter for the NSF that served as formal recognition and continued support for the NSF STTR Phase II proposal Automated High Throughput and Surface Inlet Ionization for Mass Spectrometry, which was submitted by MSTM (the "Waters 2015 NSF Letter").

103.    In the Waters 2015 NSF Letter, Waters again praises MSTM's inlet ionization technologies and states that MSTM's technologies provide the potential to have considerable impact in the field of mass spectrometry.

104.    The Waters 2015 NSF Letter states that Waters is a worldwide leader in mass spectrometry technology and as such has considerable interest in the innovation of the new ionization technologies discovered and developed by Drs. Trimpin and McEwen and commercialized by MSTM.

105.    The Waters 2015 NSF Letter also states:

The production of multiply charged ions from a MALDI-like ionization process, but without the use of a laser, is especially interesting as it allows enhanced features such as ion mobility and electron transfer dissociation, available on our advanced SYNAPT line of mass spectrometers, to be fully utilized.  Also of interest is the use

20

of our single quadrupole LC detector (QDa) mass spectrometer for matrix-assisted ionization eliminating the need for a hot inlet, nebulizing gases, and the high voltage supply necessary with ESI.  Dr. Trimpin presented this work at the ASMS 2015 conference showcasing the portable potential by acquiring data at the local Detroit hospital.

106.    The Waters 2015 NSF Letter further states:

Waters is delighted that MSTM is developing a platform for Waters mass spectrometers.  It is our opinion that developing automated and high throughput new ionization technologies, as well as a platform for surface analysis, is the correct direction for commercial success of this technology in areas such as bottom up and potentially top down proteomics, metabolomics, and other 'omics' fields, as well as eventually medical diagnostics.  Waters is highly supportive of the commercial success of MSTM in connection with Waters products and opening new markets for mass spectrometry.

107.    On June 4, 2018, Waters submitted another letter to NSF that served as formal recognition of Waters' continued support for the commercialization of MSTM's new ionization processes in mass spectrometry and MSTM's SBIR Phase 1 support proposal Robust High-Throughput Mass Spectrometry Through Vacuum Matrix-Assisted Ionization (the "Waters 2018 NSF Letter").  The Waters 2018 NSF letter is signed by Mark N. Groudas, Vice President the Americas Field Operations, at Waters.

108.    The Waters 2018 NSF Letter states that Waters has considerable interest in the new ionization technologies discovered and developed by Drs. Trimpin and McEwen and commercialized by MSTM.

109.    The Waters 2018 NSF Letter also states that Waters has instituted NDAs with Wayne State University, University of the Sciences, and MSTM.

110.    The Waters 2018 NSF Letter further states:

The potential of [MSTM's] technology to simplify the ion source, reduce pumping requirements, and further lower the cost and ease of operation has considerable commercial appeal.  Developing a rapid sample introduction method with these attributes will in my opinion have a high probability of commercial success.

We are delighted that MSTM is developing dedicated platforms based on novel ionization technologies for Waters mass spectrometers. It is our opinion that developing simpler robust ionization sources is the correct direction for commercial success of this technology in biomedical, clinical and homeland security applications. Waters is highly supportive of the commercial success of MSTM in connection with Waters products and opening new markets for mass spectrometry.

111.    On August 17, 2020, Waters submitted another letter to the NSF that served as formal recognition of Waters' continued support for the developments of ionization sources and methods of mass spectrometry by MSTM (the "Waters 2020 NSF Letter"). The Waters 2020 NSF Letter was signed by Timothy D'Souza, Vice President of Americas Filed Operations at Waters Technologies Corporation.

112.    With respect to MSTM's matrix-assisted ionization technologies, the Waters 2020 NSF Letter states:

> The current innovation is of special interest in that it addresses a ready-to-enter market space. An automated high throughput, low maintenance ion source offering both the novel vacuum matrix-assisted ionization (MAI) and established matrix-assisted laser desorption/ionization (MALDI) source that is interchangeable with the commercial ESI/APCI ion source is obviously of high interest. The potential for expanding MS, especially in clinical and biomedical applications is especially timely. Of special interest to Waters is the demonstrated ability of the new source to obtain full scan mass spectra at a rate of 1 acquisition per second. An ionization method with good sensitivity and yet not detrimentally affected by analysis of high concentration, whether purposefully or by accident, or biological samples is highly desirable in a commercial product.

113.    The Waters 2020 NSF Letter also states that Dr. Trimpin's idea of a multi-mode ionization source having the benefit of ionization in a vacuum, for sensitivity, while operational from atmospheric pressure is unique and clever and that Waters is confident that the combination of novel and traditional ionization technology coupled with a transformative sample introduction to this vacuum approach will have exceptional commercial success.

114.    The Waters 2020 NSF Letter further states that Waters is delighted that the highly innovative team of investigators, McEwen and Trimpin, are continuing to develop novel ionization technologies that can be applied to its mass spectrometers.

115.    On August 27, 2021, Waters submitted a letter to the National Institutes of Health ("NIH") that served as formal recognition of Waters' continued support for the developments of ionization sources and methods of mass spectrometry by MSTM for the SBIR Direct Phase II proposal for combating pathogens with an easy-to-use and integrated mass spectrometry detection system (the "Waters 2021 NIH Letter").

116.    In the Waters 2021 NIH Letter, as it has done for many years, Waters states that it has considerable interest in the innovation of new ionization technologies commercialized by MSTM.

117.    In the Waters 2021 NIH Letter, Waters states that Drs. McEwen and Trimpin have been innovative leaders in developing novel ionization technologies for mass spectrometry.

118.    On August 11, 2022, Waters submitted another letter to the NIH that served as formal recognition of Waters' continued support for the developments of ionization sources and methods in mass spectrometry by MSTM for the SBIR Phase I proposal Development of multimode vacuum ionization for use in medical diagnostics ("Waters 2022 NIH Letter").  This Phase I proposal was submitted by MSTM to the Small Business: Biological Chemistry, Biophysics, and Assay Development SBIR Program at the National Institutes of Health (NIH).

119.    Again, as it has done for many years, Waters states in the Waters 2022 NIH Letter that it has considerable interest in the innovation of new ionization technologies commercialized by MSTM.

120.    And again, Waters states in its 2022 NIH Letter that Drs. McEwen and Trimpin have been innovative leaders in developing novel ionization technologies for mass spectrometry.

121.    From 2013 to, at least, 2019, Waters' executives and employees made regular visits to MSTM's laboratories to observe and obtain information about MSTM's proprietary and innovative ionization technologies on mass spectrometry devices for the purpose of assessing Waters' interest in licensing MSTM's patented ionization technologies, and such Waters' executives and employees include, at least, the following: Jeff Brown (Senior Research Scientist), Steve Pringle (Senior Research Scientist), Martin Green (Consultant Research Scientist), Mike Morris (Director of MS Research), Michael Balogh (Director of Mass Spectrometry Research), Ronan O'Malley (Senior Manager Mass Spectrometry Product Management), Tim Riley (Vice President and Managing Director), Paul Murray (Research Scientist), and Kieran Neeson (Senior Software Engineer).

122.    Despite executing multiple NDAs, Waters did not comply with its obligations under those NDAs by, among other things, incorporating, without authorization, MSTM's patented ionization technologies, and confidential information into Waters' mass spectrometry devices.

123.    After many years and discussions with MSTM about its patented ionization technologies and despite Waters' gestures for a so-called "joint venture or licensing deal," Waters has not executed a patent license agreement with MSTM.

### PLAINTIFFS HAVE BEEN SUBSTANTIALLY HARMED BY WATERS' INTENTIONAL BREACH AND MISCONDUCT

124.    The ASAP Probe continues to be used by Waters in all industries where Waters engages and is presently one of the best-selling accessories for Waters.

125.    As Waters admits, in the 2013 NSF Letter, the ASAP Probe is used in all industries where Waters engages and is the single best-selling accessory in Waters' history.

126.    Acting in bad faith, Waters intentionally breached the ASAP Agreement in a deliberate attempt to obtain the benefits of the ASAP Agreement and to avoid fulfilling its obligations under the ASAP Agreement.

## COUNT I
## Breach of Contract

127.    Plaintiffs repeat, reallege, and incorporate by reference the allegations in paragraphs 1 through 126 as if fully set forth herein.

128.    The ASAP Agreement shall be construed under the law of the Commonwealth of Massachusetts.

129.    Pursuant to section 3(a) of the ASAP Agreement, "licensed patents" means (1) the patent application entitled "Atmospheric Pressure Ion Source Probe for a Mass Spectrometer" filed with the United States Patent and Trademark office on September 26, 2007 and having a patent application serial number 60/975,385 with named inventors Charles N. McEwen and Richard G. Mckay, (2) any and all applications on improvements elected by Micromass (Waters' wholly-owned subsidiary) that claim priority to subject matter disclosed or claimed in that patent application, (3) any and all United States patents that may issue as a result of the patent applications identified in clauses (1) or (2) of this Section, (4) any and all reissues, continuations, substitutions, divisionals, reexaminations or other extensions of those patents and patent applications, and (5) any and all foreign patent applications and corresponding patents in any and all countries that rely on any applications for any of the foregoing patents or patent applications for priority, and any division, or continuation thereof, any patent issuing on any such application, and all reissues, continuations, substitutions, divisionals, reexaminations, or other extensions thereof."  Ex. J.

130.    Pursuant to section 3(b) of the ASAP Agreement, Waters is required to pay a royalty of $250 U.S. dollars to M&M for each ASAP Probe that practices one or more claims of

described in the licensed patent that Waters sells in the jurisdictions in which a then valid licensed patent is issued.

131.    Waters has withheld considerable royalties to M&M from substantial amounts of sales of Waters' mass spectrometry devices, and this constitutes breach of the ASAP Agreement.

132.    In breach of the ASAP Agreement, Waters has not paid royalties due to M&M for all ASAP Probes distributed by Waters, including ASAP Probes that Waters provides free-of-charge to its customers and/or third-parties, which use Waters' mass spectrometry devices.

133.    Despite being the single-best-selling accessory Waters' history, Waters has failed to pay all royalties due to M&M on ASAP Probes sold and distributed by Waters as required under the ASAP Agreement.

134.    Waters' RADIAN ASAP device practices one or more claim of the '629 Patent. However, Waters has not paid M&M for all the required royalties from the sale or distribution of the RADIAN ASAP devices.

135.    Pursuant to section 4(c) of the ASAP Agreement, either party may terminate the agreement in the event of a breach of the agreement, upon notice and reasonable opportunity (not to exceed 30 days) to cure.

136.    By way of this Complaint, M&M provides Waters with notice that the ASAP Agreement is terminated because Waters has breached the ASAP Agreement.

137.    Waters has not admitted that it has breached the ASAP Agreement.

138.    In the event that Waters does admit that it breached the ASAP Agreement, M&M believes that Waters will not cure its breach of the ASAP Agreement within 30 days from notice of Waters' breach by way of this Complaint.

139.    M&M has been harmed by Waters' breach of the ASAP Agreement in an amount to be proven at trial.

**COUNT II**
**Breach of Implied Covenant of Good Faith and Fair Dealing**

140.    Plaintiffs repeat, reallege, and incorporate by reference the allegations in paragraphs 1 through 139 as if fully set forth herein.

141.    Pursuant to section 3(b) of the ASAP Agreement, Waters is required to pay a royalty to M&M for each ASAP Probe that practices one or more claims of the licensed patents that Waters sells in the jurisdictions in which a then valid licensed patent is issued, which is the United States.

142.    To avoid paying royalties, Waters provided ASAP Probes and/or services that practice one or more claims of the '629 Patent "free-of-charge" to customers together with the paid purchase of a Waters' mass spectrometry device.

143.    To avoid paying royalties, Waters intentionally shipped and continues to ship ASAP Probes to its wholly-owned subsidiaries located outside the United States, so that Waters' non-U.S. based companies can then sell and distribute ASAP Probes to customers located outside the United States.

144.    To avoid paying royalties, Waters intentionally shipped and continues to ship ASAP Probes to its wholly-owned subsidiaries located outside the United States, so that Waters' non-U.S. based companies can then sell or distribute ASAP Probes to customers that are located within the United States.

145.    To avoid paying royalties, Waters intentionally has its wholly-owned subsidiaries and/or partnered companies located outside the United States sell or distribute ASAP Probes to customers that are located outside and within the United States.

27

146.    Under the ASAP Agreement, Waters has a non-exclusive license to make, have made, use, sell, and have sold products and services practicing one or more claims of the licensed patents.

147.    Under the ASAP Agreement, Waters shall pay royalties to M&M for each ASAP Probe that practices one or more of the claims described in the licensed patents, which includes any and all applications on improvements elected by Micromass (Waters' wholly-owned subsidiary) that claim priority to subject matter disclosed or claimed in the patent application, which led to the '629 Patent.

148.    Acting in bad faith, and to avoid paying royalties, Waters filed, at least, one patent application that should (but does not) claim priority the '629 Patent.

149.    Acting in bad faith, and to avoid paying royalties, Wates filed, at least, one patent application that should (but did not) name Dr. McEwen and/or Dr. McKay as a co-inventor on such patent application(s).

150.    For example, Micromass (Waters' wholly-owned subsidiary) filed U.S. patent application number 13/013,066, titled "Atmospheric Pressure Solids Analysis Probe Assembly," that issued as U.S. Patent No. 8,384,026 ("Waters '026 Patent") on February 26, 2013, and which claims priority to provisional application filed on June 15, 2010.  This patent relates to improvements in the construction and use of analysis probe assemblies for atmospheric-pressure solids probe techniques in conjunction with mass spectrometers.

151.    In 2008, prior to filing the provisional application for the Waters '026 Patent, Mircomass (Waters' wholly-owned subsidiary) had access to and reviewed the unpublished patent application licensed in the ASAP Agreement.

152.    The Waters '026 Patent cites a number of Dr. McEwen's publications describing M&M's ASAP Probe patented technology.    The specification of the Waters '026 Patent specifically mentions that (i) the introduction of direct analysis in real time and desorption electrospray ionization (DESI) methods has led to the development of a technique known as atmospheric-pressure solid analysis probe and (ii) the probe is available as ASAP™ technology from M&M Mass Spec Consulting.

153.    Waters filed patent applications and obtained patents that claim an improvement of the '629 Patent without notifying M&M that Waters was seeking patent protection on subject matter that should have claimed priority to the patent application cited in the ASAP Agreement.

154.    By excluding Drs. McEwen and/or McKay as a name inventor on, at least, the Waters '026 Patent, Waters avoids paying M&M royalties for the life the Waters '026 Patent, which expires after the '629 Patent.

155.    By failing to elect to claim that the priority of, at least, the Waters '026 Patent should be that of the '629 Patent, Waters has avoided paying M&M royalties for the life of the Waters '026 Patent, which expires after the '629 Patent.

156.    In addition, after execution of the ASAP Agreement, Waters created new products (e.g., RADIAN ASAP) that are based on the ASAP patented technology that are within the scope of the claims of the '629 Patent without notifying M&M, and such Waters' ASAP products were not originally contemplated by the parties at the time the ASAP Agreement was negotiated and executed.

157.    Waters has acted in bad faith when exercising its responsibilities and performing its obligations under the ASAP Agreement, and as a result of Waters' misconduct, M&M has been deprived of receiving its full benefits entitled under the ASAP Agreement.

158.    Waters has acted unreasonably in exercising its responsibilities and performing its obligations under the ASAP Agreement, which has deprived M&M of receiving its full benefit entitled under the ASAP Agreement.

159.    M&M has been harmed by Waters' breach of an implied covenant of good faith and fair dealing in connection with the ASAP Agreement in an amount to be proven at trial.

## WATERS HAS INFRINGED THE PATENTS-IN-SUIT AND HAS BEEN DOING SO WILLFULLY

160.    Waters has had actual knowledge of the Patents-in-Suit for, at least, the past six years.

161.    Waters has not obtained a license or otherwise acquired rights from MSTM for use of MSTM's patented ionization technologies embodied in the Patents-in-Suit. Rather, Waters chose a path of willful infringement.

162.    At a minimum, Waters has been willfully blind to the fact that its mass spectrometry devices infringe one or more claims of each of the Patents-in-Suit. Waters should have known that the accused mass spectrometry devices infringe one or more claims of each of the Patents-in-Suit.

## COUNT III
### Infringement of the '629 Patent

163.    Plaintiffs repeat, reallege, and incorporate by reference the allegations in paragraphs 1 through 162 as if fully set forth herein.

164.    The cause of action for Waters' infringement of the '629 Patent arises under 35 U.S.C. §§ 271(a), 271(b) and/or 271(c).

165.    The attached Exhibit K, identifies by example where and how each element of one or more claims of the '629 Patent are found within Waters' mass spectrometer devices, which include but are not limited to the RADIAN ASAP.

166.     Waters has directly and/or indirectly infringed claims 1 to 26 of the '629 Patent, either literally or under the doctrine of equivalents.  *See* Ex. K.

167.     In violation of 35 U.S.C. § 271(a), Waters has directly infringed and continues to directly infringe one or more claims of the '629 Patent by making, using, offering to sell, selling, and/or importing into the United States the accused mass spectrometry products, including without limitation the RADIAN ASAP, that practice one or more claim of the '629 Patent.

168.     In violation of 35 U.S.C. § 271(b), Waters has indirectly infringed and continues to indirectly infringe at least one claim of the '629 Patent by actively inducing third parties to sell, offer to sell, use and/or import into the United States the accused infringing products to directly infringe one or more claims of the '629 Patent.  Waters has taken and continues to take active steps to encourage and facilitate third parties to directly infringe one or more claims of the '629 Patent with the specific intent to infringe or with willful blindness to that infringement.  Waters' affirmative acts include, without limitation, providing instructions, videos, demonstrations, operating manuals, educational materials, website materials, and technical support to third parties that aid and abet or facilitate the direct infringement of one or more claims of the '629 Patent. Third parties directly infringe one or more claims when they use Waters' mass spectrometry devices, including without limitation, the RADIAN ASAP for their intended purpose in accordance with Waters' instructions.

169.     In violation of 35 U.S.C. § 271(c), Waters has contributed to and continues to contribute to the infringement of one or more claims of the '629 Patent by, among other things, making using, offering to sell, selling and/or importing into the United States, without authority or license, accused mass spectrometry devices, including without limitation the RADIAN ASAP, and such accused mass spectrometry devices embody a material part of the claimed inventions in the

'629 Patent, knowing that such products and/or components were specifically made or specially adapted for use in an infringing manner, and that they are not staple articles of commerce suitable for a substantial non-infringing use.

170.    Waters' infringement of the '629 Patent has been willful and continues to be willful. Waters has had and currently has knowledge of its infringement of the '629 Patent, including at least for the reasons that (i) Waters knowingly breached the ASAP Agreement, and (ii) when promoting the RADIAN ASAP, Waters admitted that the "ASAP ionization itself was developed by [Dr.] Chuck McEwen and his group in 2005," and "for the RADIAN instrument, [Waters] redesigned the ASAP source to incorporate horizontal sample loader." *See* https://youtu.be/AViDyi0Qp0I. Waters continued to infringe despite having knowledge of its infringement or being willfully blind to its infringement.

171.    Waters has committed and continues to commit these acts of infringement of one or more claims of the '629 Patent without a valid license or authorization.

172.    As a result of Waters' infringement of the '629 Patent, M&M has suffered damages and will continue to suffer damages, including damages awardable under 35 U.S.C. §§ 284 and 285.

**COUNT IV**
**Infringement of the '973 Patent**

173.    Plaintiffs repeat, reallege, and incorporate by reference the allegations in paragraphs 1 through 172 as if fully set forth herein.

174.    The cause of action for Waters' infringement of the '973 Patent arises under 35 U.S.C. §§ 271(a), 271(b) and/or 271(c).

175.    The attached Exhibit L, identifies by example where and how each element of one or more claims of the '973 Patent are found within Waters' mass spectrometer devices, which

include but are not limited to SELECT SERIES Cyclic IMS, SYNAPT XS, Vion IMS, Xevo TQ-MQ, Xevo TQ-S, Acquity QDa, Rapid Evaporative Ionization Mass Spectrometry ("REIMS"), REIMS with iKnife, and UniSpray source collectively, "Waters' MS Devices."

176.    Waters has directly or indirectly infringed claims 1 to 24 of the '973 Patent, either literally or under the doctrine of equivalents. *See* Ex. L.

177.    In violation of 35 U.S.C. § 271(a), Waters has directly infringed and continues to directly infringe one or more claims of the '973 Patent by making, using, offering to sell, selling within, and/or importing into the United States, at least, the accused Waters' MS Devices that practice one or more claim of the '973 Patent.

178.    In violation of 35 U.S.C. § 271(b), Waters has indirectly infringed and continues to indirectly infringe at least one claim of the '973 Patent by actively inducing third parties to sell, offer to sell, use and/or import into the United States, at least, the accused Waters' MS Devices to directly infringe one or more claims of the '973 Patent.  Waters has taken and continues to take active steps to encourage and facilitate third parties to directly infringe one or more claims of the '973 Patent with the specific intent to infringe or with willful blindness to that infringement. Waters' affirmative acts include, without limitation, providing instructions, videos, demonstrations, operating manuals, educational materials, website materials, and technical support to third parties that aid and abet or facilitate the direct infringement of one or more claims of the '973 Patent.  Third parties directly infringe one or more claims when they use the accused Waters' MS Devices for their intended purpose in accordance with Waters' instructions.

179.    In violation of 35 U.S.C. § 271(c), Waters has contributed to and continues to contribute to the infringement of one or more claims of the '973 Patent by, among other things, making using, offering to sell, selling within and/or importing into the United States, without

authority or license, at least, the accused Waters' MS Devices, and such accused Waters' MS Devices embody a material part of the claimed inventions in the '973 Patent, knowing that such products and/or components were specifically made or specially adapted for use in an infringing manner, and that they are not staple articles of commerce suitable for a substantial non-infringing use.

180.    Waters' infringement of the '973 Patent has been willful and continues to be willful. Waters has had and currently has knowledge of its infringement of the '973 Patent, including at least for the reasons that (i) Waters entered into NDAs with MSTM and Drs. McEwen and Trimpin to obtain confidential information and pending unpublished patent applications in order to assess Waters' interest in licensing and commercially developing the technology embodied in the '973 Patent and (ii) Waters told the NSF that Waters sees a bright future for the utility of MSTM's new ionization technology covered by '973 Patent on Waters' mass spectrometry instruments, such as the SYNAPT series.  In addition, Waters admitted in the Waters 2020 NSF Letter that MSTM's novel patented technologies can be applied to Waters' mass spectrometers.  Waters has infringed and continues to infringe despite having knowledge of its infringement or being willfully blind to its infringement.

181.    Waters has committed and continues to commit these acts of infringement of the '973 Patent without a license or authorization.

182.    As a result of Waters' infringement of the '973 Patent, MSTM has suffered damages and will continue to suffer damages, including damages awardable under 35 U.S.C. §§ 284 and 285.

## COUNT V
### Infringement of the '096 Patent

183.    Plaintiffs repeat, reallege, and incorporate by reference the allegations in paragraphs 1 through 182 as if fully set forth herein.

184.    The cause of action for Waters' infringement of the '096 Patent arises under 35 U.S.C. §§ 271(a), 271(b) and/or 271(c).

185.    The attached Exhibit M, identifies by example where and how each element of one or more claims of the '096 Patent are found within Waters' mass spectrometer devices, which include but are not limited to SELECT SERIES Cyclic IMS, SYNAPT XS, Vion IMS, Xevo TQ-MQ, Xevo TQ-S, Acquity QDa, REIMS, REIMS with iKnife, and UniSpray source collectively, "Waters' MS Devices."

186.    Waters has directly or indirectly infringed claims 1 to 24 of the '096 Patent, either literally or under the doctrine of equivalents. *See* Ex. M.

187.    In violation of 35 U.S.C. § 271(a), Waters has directly infringed and continues to directly infringe one or more claims of the '096 Patent by making, using, offering to sell, selling within and/or importing into the United States, at least, the accused Waters' MS Devices that practice one or more claim of the '096 Patent.

188.    In violation of 35 U.S.C. § 271(b), Waters has indirectly infringed and continues to indirectly infringe at least one claim of the '096 Patent by actively inducing third parties to sell, offer to sell, use and/or import into the United States, at least, the accused Waters' MS Devices to directly infringe one or more claims of the '096 Patent. Waters has taken and continues to take active steps to encourage and facilitate third parties to directly infringe one or more claims of the '096 Patent with the specific intent to infringe or with willful blindness to that infringement. Waters' affirmative acts include, without limitation, providing instructions, videos,

demonstrations, operating manuals, educational materials, website materials, and technical support to third parties that aid and abet or facilitate the direct infringement of one or more claims of the '096 Patent. Third parties directly infringe one or more claims when they use the accused Waters' MS Devices for their intended purpose in accordance with Waters' instructions.

189.    In violation of 35 U.S.C. § 271(c), Waters has contributed to and continues to contribute to the infringement of one or more claims of the '096 Patent by, among other things, making using, offering to sell, selling within and/or importing into the United States, without authority or license, at least, the accused Waters' MS Devices, and such accused Waters' MS Devices embody a material part of the claimed inventions in the '096 Patent, knowing that such products and/or components were specifically made or specially adapted for use in an infringing manner, and that they are not staple articles of commerce suitable for a substantial non-infringing use.

190.    Waters has had and currently has knowledge of its infringement of the '096 Patent, including at least for the reasons that (i) Waters entered into NDAs with MSTM and Drs. McEwen and Trimpin to obtain confidential information and pending unpublished patent applications in order to assess Waters' interest in licensing and commercially developing the technology embodied in the '096 Patent and (ii) Waters told the NSF that Waters sees a bright future for the utility of MSTM's new ionization technology covered by the '096 Patent and used on Waters' mass spectrometry instruments, such as the SYNAPT series. In addition, Waters admitted in the Waters 2020 NSF Letter that MSTM's novel patented technologies can be applied to Waters' mass spectrometers. Waters has infringed and continues to infringe despite having knowledge of its infringement or being willfully blind to its infringement.

191.    Waters has committed and continues to commit these acts of infringement of the '096 Patent without a license or authorization.

192.    As a result of Waters' infringement of the '096 Patent, MSTM has suffered damages and will continue to suffer damages, including damages awardable under 35 U.S.C. §§ 284 and 285.

## COUNT VI
## Infringement of the '894 Patent

193.    Plaintiffs repeat, reallege, and incorporate by reference the allegations in paragraphs 1 through 192 as if fully set forth herein.

194.    The cause of action for Waters' infringement of the '894 Patent arises under 35 U.S.C. §§ 271(a), 271(b) and/or 271(c).

195.    The attached Exhibit N, identifies by example where and how each element of one or more claims of the '894 Patent are found within Waters' mass spectrometer devices, which include but are not limited to SELECT SERIES Cyclic IMS, SYNAPT XS, Vion IMS, Xevo TQ-MQ, Xevo TQ-S, Acquity QDa, REIMS, REIMS with iKnife, and UniSpray source collectively, "Waters' MS Devices."

196.    Waters has directly or indirectly infringed claims 1 to 31 of the '894 Patent, either literally or under the doctrine of equivalents. *See* Ex. N.

197.    In violation of 35 U.S.C. § 271(a), Waters has directly infringed and continues to directly infringe one or more claims of the '894 Patent by making, using, offering to sell, selling within, and/or importing into the United States, at least, the accused Waters' MS Devices that practice one or more claim of the '894 Patent.

198.    In violation of 35 U.S.C. § 271(b), Waters has indirectly infringed and continues to indirectly infringe at least one claim of the '894 Patent by actively inducing third parties to sell,

offer to sell, use and/or import into the United States, at least, the accused Waters' MS Devices to directly infringe one or more claims of the '894 Patent. Waters has taken and continues to take active steps to encourage and facilitate third parties to directly infringe one or more claims of the '894 Patent with the specific intent to infringe or with willful blindness to that infringement. Waters' affirmative acts include, without limitation, providing instructions, videos, demonstrations, operating manuals, educational materials, website materials, and technical support to third parties that aid and abet or facilitate the direct infringement of one or more claims of the '894 Patent. Third parties directly infringe one or more claims when they use the accused Waters' MS Devices for their intended purpose in accordance with Waters' instructions.

199.    In violation of 35 U.S.C. § 271(c), Waters has contributed to and continues to contribute to the infringement of one or more claims of the '894 Patent by, among other things, making using, offering to sell, selling within and/or importing into the United States, without authority or license, at least, the accused Waters' MS Devices, and such accused Waters' MS Devices embody a material part of the claimed inventions in the '894 Patent, knowing that such products and/or components were specifically made or specially adapted for use in an infringing manner, and that they are not staple articles of commerce suitable for a substantial non-infringing use.

200.    Waters has had and currently has knowledge of its infringement of the '894 Patent, including at least for the reasons that (i) Waters entered into NDAs with MSTM and Drs. McEwen and Trimpin to obtain confidential information and pending unpublished patent applications in order to assess Waters' interest in licensing and commercially developing the technology embodied in the '894 Patent and (ii) Waters told the NSF that Waters sees a bright future for the utility of MSTM's new ionization technology covered by the '894 Patent and used in Waters' mass

spectrometry instruments, such as the SYNAPT series.  In addition, Waters admitted in the Waters 2020 NSF Letter that MSTM's novel patented technologies can be applied to Waters' mass spectrometers.  Waters has infringed and continues to infringe despite having knowledge of its infringement or being willfully blind to its infringement.

201.    Waters has committed and continues to commit these acts of infringement of the '894 Patent without a license or authorization.

202.    As a result of Waters' infringement of the '894 Patent, MSTM has suffered damages and will continue to suffer damages, including damages awardable under 35 U.S.C. §§ 284 and 285.

## COUNT VII
### Infringement of the '458 Patent

203.    Plaintiffs repeat, reallege, and incorporate by reference the allegations in paragraphs 1 through 202 as if fully set forth herein.

204.    The cause of action for Waters' infringement of the '458 Patent arises under 35 U.S.C. §§ 271(a), 271(b) and/or 271(c).

205.    The attached Exhibit O, identifies by example where and how each element of one or more claims of the '458 Patent are found within Waters' mass spectrometer devices, which include but are not limited to SELECT SERIES Cyclic IMS, SYNAPT XS, Vion IMS, Acquity QDa, Xevo TQ-MQ, and Xevo TQ-S, collectively, "Waters' MS Devices."

206.    Waters has directly or indirectly infringed claims 1 to 27 of the '458 Patent, either literally or under the doctrine of equivalents.  *See* Ex. O.

207.    In violation of 35 U.S.C. § 271(a), Waters has directly infringed and continues to directly infringe one or more claims of the '458 Patent by making, using, offering to sell, selling

within, and/or importing into the United States, at least, the accused Waters' MS Devices that practice one or more claim of the '458 Patent.

208.     In violation of 35 U.S.C. § 271(b), Waters has indirectly infringed and continues to indirectly infringe at least one claim of the '458 Patent by actively inducing third parties to sell, offer to sell, use and/or import into the United States, at least, the accused Waters' MS Devices to directly infringe one or more claims of the '458 Patent.  Waters has taken and continues to take active steps to encourage and facilitate third parties to directly infringe one or more claims of the '458 Patent with the specific intent to infringe or with willful blindness to that infringement. Waters' affirmative acts include, without limitation, providing instructions, videos, demonstrations, operating manuals, educational materials, website materials, and technical support to third parties that aid and abet or facilitate the direct infringement of one or more claims of the '458 Patent.  Third parties directly infringe one or more claims when they use the accused Waters' MS Devices for their intended purpose in accordance with Waters' instructions.

209.     In violation of 35 U.S.C. § 271(c), Waters has contributed to and continues to contribute to the infringement of one or more claims of the '458 Patent by, among other things, making using, offering to sell, selling within and/or importing into the United States, without authority or license, at least, the accused Waters' MS Devices, and such accused Waters' MS Devices embody a material part of the claimed inventions in the '458 Patent, knowing that such products and/or components were specifically made or specially adapted for use in an infringing manner, and that they are not staple articles of commerce suitable for a substantial non-infringing use.

210.     Waters' infringement of the '458 Patent has been willful and continues to be willful. Waters has had and currently has knowledge of its infringement of the '458 Patent, including at

least for the reasons that (i) Waters entered into NDAs with MSTM and Drs. McEwen and Trimpin to obtain confidential information and pending unpublished patent applications in order to assess Waters' interest in licensing and commercially developing the technology embodied in the '458 Patent and (ii) Waters told the NSF that Waters was delighted that MSTM developed the novel ionization technologies covered by the '458 Patent for use in Waters' mass spectrometers.  In addition, Waters admitted in the Waters 2020 NSF Letter that MSTM's novel patented technologies can be applied to Waters' mass spectrometers.  Waters has infringed and continues to infringe despite having knowledge of its infringement or being willfully blind to its infringement.

211.    Waters has committed and continues to commit these acts of infringement of the '458 Patent without a license or authorization.

212.    As a result of Waters' infringement of the '458 Patent, MSTM has suffered damages and will continue to suffer damages, including damages awardable under 35 U.S.C. §§ 284 and 285.

**COUNT VIII**
**Infringement of the '909 Patent**

213.    Plaintiffs repeat, reallege, and incorporate by reference the allegations in paragraphs 1 through 212 as if fully set forth herein.

214.    The cause of action for Waters' infringement of the '909 Patent arises under 35 U.S.C. §§ 271(a), 271(b) and/or 271(c).

215.    The attached Exhibit P, identifies by example where and how each element of one or more claims of the '909 Patent are found within Waters' mass spectrometer devices, which include but are not limited to SYNAPT XS, SYNAPT G2, Micromass® MALDI micro MX™,

SELECT SERIES Cyclic IMS, SELECT SERIES MRT, Vion IMS, Acquity QDa, Xevo TQ-MQ, and Xevo TQ-S, collectively "Waters' MS Devices."

216.    Waters has directly or indirectly infringed claims 1 to 20 of the '909 Patent, either literally or under the doctrine of equivalents. *See* Ex. P.

217.    In violation of 35 U.S.C. § 271(a), Waters has directly infringed and continues to directly infringe one or more claims of the '909 Patent by making, using, offering to sell, selling within and/or importing into the United States, at least, the accused Waters' MS Devices that practice one or more claim of the '909 Patent.

218.    In violation of 35 U.S.C. § 271(b), Waters has indirectly infringed and continues to indirectly infringe at least one claim of the '909 Patent by actively inducing third parties to sell, offer to sell, use and/or import into the United States, at least, the accused Waters' MS Devices to directly infringe one or more claims of the '909 Patent.  Waters has taken and continues to take active steps to encourage and facilitate third parties to directly infringe one or more claims of the '909 Patent with the specific intent to infringe or with willful blindness to that infringement. Waters' affirmative acts include, without limitation, providing instructions, videos, demonstrations, operating manuals, educational materials, website materials, and technical support to third parties that aid and abet or facilitate the direct infringement of one or more claims of the '909 Patent.  Third parties directly infringe one or more claims when they use the accused Waters' MS Devices for their intended purpose in accordance with Waters' instructions.

219.    In violation of 35 U.S.C. § 271(c), Waters has contributed to and continues to contribute to the infringement of one or more claims of the '909 Patent by, among other things, making using, offering to sell, selling within and/or importing into the United States, without authority or license, at least, the accused Waters' MS Devices, and such accused Waters' MS

Devices embody a material part of the claimed inventions in the '909 Patent, knowing that such products and/or components were specifically made or specially adapted for use in an infringing manner, and that they are not staple articles of commerce suitable for a substantial non-infringing use.

220.    Waters' infringement of the '909 Patent has been willful and continues to be willful. Waters has had and currently has knowledge of its infringement of the '909 Patent, including at least for the reasons that (i) Waters entered into NDAs with MSTM and Drs. McEwen and Trimpin to obtain confidential information and pending unpublished patent applications in order to assess Waters' interest in licensing and commercially developing the technology embodied in the '909 Patent and (ii) Waters told the NSF that Waters was delighted that MSTM developed novel ionization technologies covered by the '909 Patent for use in Waters' mass spectrometers.  In addition, Waters admitted in the Waters 2020 NSF Letter that MSTM's novel patented technologies can be applied to Waters' mass spectrometers.  Waters has infringed and continues to infringe despite having knowledge of its infringement or being willfully blind to its infringement.

221.    Waters has committed and continues to commit these acts of infringement of the '909 Patent without a license or authorization.

222.    As a result of Waters' infringement of the '909 Patent, MSTM has suffered damages and will continue to suffer damages, including damages awardable under 35 U.S.C. §§ 284 and 285.

## COUNT IX
## Infringement of the '838 Patent

223.    Plaintiffs repeat, reallege, and incorporate by reference the allegations in paragraphs 1 through 222 as if fully set forth herein.

224.    The cause of action for Waters' infringement of the '838 Patent arises under 35 U.S.C. §§ 271(a), 271(b) and/or 271(c).

225.    The attached Exhibit Q, identifies by example where and how each element of one or more claims of the '838 Patent are found within Waters' mass spectrometer devices, which include but are not limited to SYNAPT XS, SYNAPT G2, Micromass® MALDI micro MX™, SELECT SERIES Cyclic IMS, SELECT SERIES MRT, Vion IMS, Acquity QDa, Xevo TQ-MQ, and Xevo TQ-S, collectively, "Waters' MS Devices."

226.    Waters has directly or indirectly infringed claims 1 to 20 of the '838 Patent, either literally or under the doctrine of equivalents. *See* Ex. Q.

227.    In violation of 35 U.S.C. § 271(a), Waters has directly infringed and continues to directly infringe one or more claims of the '838 Patent by making, using, offering to sell, and/or importing into the United States, at least, the accused Waters' MS Devices that practice one or more claim of the '838 Patent.

228.    In violation of 35 U.S.C. § 271(b), Waters has indirectly infringed and continues to indirectly infringe at least one claim of the '838 Patent by actively inducing third parties to sell, offer to sell, use and/or import into the United States, at least, the accused Waters' MS Devices to directly infringe one or more claims of the '838 Patent.  Waters has taken and continues to take active steps to encourage and facilitate third parties to directly infringe one or more claims of the '838 Patent with the specific intent to infringe or with willful blindness to that infringement. Waters' affirmative acts include, without limitation, providing instructions, videos, demonstrations, operating manuals, educational materials, website materials, and technical support to third parties that aid and abet or facilitate the direct infringement of one or more claims of the

'838 Patent. Third parties directly infringe one or more claims when they use the accused Waters' MS Devices for their intended purpose in accordance with Waters' instructions.

229.    In violation of 35 U.S.C. § 271(c), Waters has contributed to and continues to contribute to the infringement of one or more claims of the '838 Patent by, among other things, making using, offering to sell, selling within and/or importing into the United States, without authority or license, at least, the accused Waters' MS Devices, and such accused Waters' MS Devices embody a material part of the claimed inventions in the '838 Patent, knowing that such products and/or components were specifically made or specially adapted for use in an infringing manner, and that they are not staple articles of commerce suitable for a substantial non-infringing use.

230.    Waters' infringement of the '838 Patent has been willful and continues to be willful. Waters has had and currently has knowledge of its infringement of the '838 Patent, including at least for the reasons that (i) Waters entered into NDAs with MSTM and Drs. McEwen and Trimpin to obtain confidential information and pending unpublished patent applications in order to assess Waters' interest in licensing and commercially developing the technology embodied in the '838 Patent and (ii) Waters told the NSF that Waters was delighted that MSTM developed novel ionization technologies covered by the '838 Patent for use in Waters' mass spectrometers. In addition, Waters admitted in the Waters 2020 NSF Letter that MSTM's novel patented technologies can be applied to Waters' mass spectrometers. Waters has infringed and continues to infringe despite having knowledge of its infringement or being willfully blind to its infringement.

231.    Waters continued to infringe despite having knowledge of its infringement or being willfully blind to its infringement.

232.    Waters has committed and continues to commit these acts of infringement of the '838 Patent without a license or authorization.

233.    As a result of Waters' infringement of the '838 Patent, MSTM has suffered damages and will continue to suffer damages, including damages awardable under 35 U.S.C. §§ 284 and 285.

## COUNT X
## Infringement of the '648 Patent

234.    Plaintiffs repeat, reallege, and incorporate by reference the allegations in paragraphs 1 through 233 as if fully set forth herein.

235.    The cause of action for Waters' infringement of the '648 Patent arises under 35 U.S.C. §§ 271(a), 271(b) and/or 271(c).

236.    The attached Exhibit R, identifies by example where and how each element of one or more claims of the '648 Patent are found within Waters' mass spectrometer devices, which include but are not limited to SYNAPT XS and SYNAPT G2 (collectively "SYNAPT MS"), Micromass® MALDI micro MX™, SELECT SERIES Cyclic IMS, SELECT SERIES MRT, Vion IMS, Acquity QDa, Xevo TQ-MQ, and Xevo TQ-S, collectively, "Waters' MS Devices."

237.    Waters has directly or indirectly infringed claims 1 to 19 of the '648 Patent, either literally or under the doctrine of equivalents.  *See* Ex. R.

238.    In violation of 35 U.S.C. § 271(a), Waters has directly infringed and continues to directly infringe one or more claims of the '648 Patent by making, using, offering to sell, and/or importing into the United States, at least, the accused Waters' MS Devices that practice one or more claim of the '648 Patent.

239.    In violation of 35 U.S.C. § 271(b), Waters has indirectly infringed and continues to indirectly infringe at least one claim of the '648 Patent by actively inducing third parties to sell,

offer to sell, use and/or import into the United States, at least, the accused Waters' MS Devices to directly infringe one or more claims of the '648 Patent. Waters has taken and continues to take active steps to encourage and facilitate third parties to directly infringe one or more claims of the '648 Patent with the specific intent to infringe or with willful blindness to that infringement. Waters' affirmative acts include, without limitation, providing instructions, videos, demonstrations, operating manuals, educational materials, website materials, and technical support to third parties that aid and abet or facilitate the direct infringement of one or more claims of the '648 Patent. Third parties directly infringe one or more claims when they use the accused Waters' MS Devices for their intended purpose in accordance with Waters' instructions.

240.    In violation of 35 U.S.C. § 271(c), Waters has contributed to and continues to contribute to the infringement of one or more claims of the '648 Patent by, among other things, making using, offering to sell, selling within and/or importing into the United States, without authority or license, at least, the accused Waters' MS Devices, and such accused Waters' MS Devices embody a material part of the claimed inventions in the '648 Patent, knowing that such products and/or components were specifically made or specially adapted for use in an infringing manner, and that they are not staple articles of commerce suitable for a substantial non-infringing use.

241.    Waters' infringement of the '648 Patent has been willful and continues to be willful. Waters has had and currently has knowledge of its infringement of the '648 Patent, including at least for the reasons that (i) Waters entered into NDAs with MSTM and Drs. McEwen and Trimpin to obtain confidential information and pending unpublished patent applications in order to assess Waters' interest in licensing and commercially developing the technology embodied in the '648 Patent and (ii) Waters told the NSF that Waters was delighted that MSTM developed novel

ionization technologies covered by the '648 Patent for use in Waters' mass spectrometers. In addition, Waters admitted in the Waters 2020 NSF Letter that MSTM's novel patented technologies can be applied to Waters' mass spectrometers. Waters has infringed and continues to infringe despite having knowledge of its infringement or being willfully blind to its infringement.

242. Waters continued to infringe despite having knowledge of its infringement or being willfully blind to its infringement.

243. Waters has committed and continues to commit these acts of infringement of the '648 Patent without a license or authorization.

244. As a result of Waters' infringement of the '648 Patent, MSTM has suffered damages and will continue to suffer damages, including damages awardable under 35 U.S.C. §§ 284 and 285.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in Plaintiffs' favor against Waters, and provide Plaintiffs with the following relief:

A. That Defendant breached the ASAP Agreement;

B. That Defendant breached an implied covenant of good faith and fair dealings in connection with the ASAP Agreement;

C. That Defendant provides M&M an accounting of all gains, profits and advantages derived by Defendant's breach of the ASAP Agreement, and that M&M be awarded damages adequate to compensate Plaintiff M&M for Defendant's intentional and willful breach of the ASAP Agreement;

D. That Defendant has directly infringed each of the Patents-in-Suit under 35 U.S.C. § 271(a);

E.      That Defendant has induced the infringement by third parties of each of the Patents-in-Suit under 35 U.S.C. § 271(b);

F.      That Defendant has contributed to the infringement of third parties of each of the Patents-in-Suit under 35 U.S.C. § 271(c);

G.      Award MSTM, as the prevailing party, all of its costs, including reasonable attorneys' fees, as required pursuant to the 2011 USciences NDA, and pursuant to 35 U.S.C. § 285 and all other applicable statutes, rules and common law;

H.      That Plaintiffs be awarded all damages adequate to compensate Plaintiffs for Defendant's past infringement and any continuing or future infringement of the Patents-in-Suit until the date such judgment is entered, including pre- and post-judgment interest, cost, and disbursement as justified under 35 U.S.C. § 284;

I.      That the damages awarded to Plaintiffs with respect to each of the Patents-in-Suit be increased up to three times, in view of Defendant's willful infringement, in accordance with 35 U.S.C. § 284;

J.      That this case be declared an exceptional one in favor of Plaintiffs under 35 U.S.C. § 285, and that Plaintiffs be awarded its reasonable attorneys' fees and other expenses incurred in connection with this action in accordance with 35 U.S.C. § 285 and Rule 54(d) of the Federal Rules of Civil Procedure;

K.      That Plaintiffs be awarded an ongoing license fee;

L.      That Plaintiffs be awarded all equitable relief the Court deems just and proper as a result of Defendant's infringement, including an injunction; and

M.      That Plaintiff be awarded any and all other relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiffs hereby demand a trial by jury of all issues so triable.

49

Dated: March 8, 2023                     Respectfully submitted,

                                         /s/ Erika M. Page
                                         Erika M. Page (BBO 700052)
                                         FOX ROTHSCHILD LLP
                                         33 Arch Street, Suite 3110
                                         Boston, MA 02110
                                         (617) 848-4000
                                         epage@foxrothschild.com

                                         Wanda French-Brown (pro hac vice pending)
                                         Howard Suh (pro hac vice pending)
                                         FOX ROTHSCHILD LLP
                                         101 Park Avenue, 17th Floor
                                         New York, NY 10178
                                         (646) 601-7617
                                         wfrench-brown@foxrothschild.com
                                         hsuh@foxrothschild.com

                                         Joe G. Chen, Ph.D. (pro hac vice pending)
                                         FOX ROTHSCHILD LLP
                                         997 Lenox Drive
                                         Lawrenceville, NJ 08648
                                         (609) 844-3024
                                         joechen@foxrothschild.com

                                         *Attorneys for Plaintiffs MSTM, LLC and*
                                         *M&M Mass Spec Consulting, LLC*