## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

MSTM, LLC and M&M MASS SPEC
CONSULTING, LLC,

             Plaintiffs,

    v.

WATERS CORPORATION,

             Defendant.

Civ. No.: 4:23-cv-40027-MRG

## <u>MEMORANDUM & ORDER ON DEFENDANT'S MOTION TO DISMISS [ECF No. 27]</u>

**GUZMAN, J.**

Plaintiffs MSTM, LLC ("MSTM") and M&M Mass Spec Consulting, LLC ("M&M") (collectively, "Plaintiffs") bring this action against Defendant Waters Corporation ("Waters" or "Defendant"), alleging that Waters, after entering into various non-disclosure agreements to evaluate potential licensing of Plaintiffs' patented ionization technologies, began manufacturing, using, selling, and importing mass spectrometry products that infringe the Patents-in-Suit without authorization. [Am. Compl., ¶¶ 11–14, ECF No. 26].

Before the Court is Defendant's Motion to Dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6). [Def.'s Mot. Dismiss, ECF No. 27]. After careful consideration and oral argument, [ECF No. 53], the Motion to Dismiss, [ECF No. 27], was **<u>DENIED</u>** by electronic order, [ECF No. 66]. This Memorandum provides the reasoning for the Court's ruling, [ECF No. 66].

I.      **BACKGROUND**

The following relevant facts are taken primarily from the allegations in Plaintiffs' Amended Complaint and are accepted as true for purposes of this motion. Ruivo v. Wells Fargo Bank, N.A., 766 F.3d 87, 90 (1st Cir. 2014) (explaining that a reviewing court "must separate the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited)."). All plausible inferences are made in Plaintiffs' favor. Id.

A.  **The Patents-in-Suit**

Between July 12, 2011, and August 30, 2022, the United States Patent and Trademark Office ("USPTO") issued eight patents relating to mass spectrometry: U.S. Patent Nos. 7,977,629 ("the '629 Patent"), 9,105,458 ("the '458 Patent"), 10,679,838 ("the '838 Patent"), 11,430,648 ("the '648 Patent"), 9,870,909 ("the '909 Patent"), 9,552,973 ("the '973 Patent"), 10,128,096 ("the '096 Patent"), and 10,796,894 ("the '894 Patent") (collectively, the "Patents-in-Suit").[1, 2] [Am. Compl. ¶¶ 1, 25–32]. The Patents-in-Suit relate to mass spectrometry and complex analytical instruments that identify and quantify compounds within a sample. [Id. ¶ 2]. Mass spectrometry is a key technology for drug development, proteomics, metabolomics, chemical analyses, and pharmaceutical testing and are supplied to scientists, academic and government laboratories, and industry customers throughout the world. [Id.; ECF No. 29 at 1].

---

[1] At oral argument, it was represented to the Court that a patent family is one or more patents that spring from the same application, and in the present action there are four patent families at issue, '629 Patent, '973 Patent family, '458 Patent family, and the '909 patent. [H'rg Tr. Jan. 10, 2024, ECF No. 54, (hereinafter "Tr.") 9:8-15].

[2] The Patents-in-Suit are attached as exhibits to the Amended Complaint. See Ex. A, ECF No. 26-1; Ex. B, ECF No. 26-2; Ex. C, ECF No. 26-3; Ex. D, ECF No. 26-4; Ex. E, ECF No. 26-5; Ex. F, ECF No. 26-6; Ex. H, ECF No. 26-8; Ex. I, ECF No. 26-9.

On July 12, 2011, the USPTO issued U.S. Patent No. 7,976,629 ("the '629 Patent"), entitled "Atmospheric Pressure Ion Source Probe for a Mass Spectrometer," to inventors Charles Nehemiah McEwen and Richard Garrett McKay. [Am. Compl. ¶ 25]. Dr. Charles Nehemiah McEwen co-invented the technology known as the "Atmospheric Solids Analysis Probe" ("ASAP" or "ASAP Probe"), which is embodied in the '629 Patent. [Id. ¶ 34].

On August 11, 2015, the USPTO issued U.S. Patent No. 9,104,458 ("the '458 Patent"), entitled "System and Methods for Ionizing Compounds Using Matrix-Assistance for Mass Spectrometry and Ion Mobility Spectrometry," to inventors Sarah Trimpin and Ellen dela Victoria Inutan. [Id. ¶ 26]. On June 9, 2020, U.S. Patent No. 10,674,838 ("the '838 Patent") and on August 30, 2022, U.S. Patent No. 11,435,648 ("the '648 Patent") were issued to the same inventors under the same title. [Id. ¶¶ 27–28].

On January 24, 2017, November 13, 2018, and October 6, 2020, respectively, the USPTO issued U.S. Patent Nos. 9,557,973 ("the '973 Patent"), 10,131,096 ("the '096 Patent"), and 10,802,894 ("the '894 Patent"), each entitled "System and Method for Ionization of Molecules for Mass Spectrometry and Ion Mobility Spectrometry," to inventors Charles Nehemiah McEwen, Sarah Trimpin, and Vincent Salvatore Pagnotti. [Id. ¶¶ 30–32]. On January 16, 2018, the USPTO issued U.S. Patent No. 9,864,909 ("the '909 Patent"), entitled "Compositions and Methods for Mass Spectrometry," to inventor Sarah Trimpin. [Id. ¶ 29].[3]

---

[3] The Court notes that paragraph 29 of the Amended Complaint references both the '648 and '909 Patents and assumes based on the context of this section that the Plaintiffs intended to refer to '909 Patent only.

### B. **The Parties and Their Interests**

Plaintiff M&M Mass Spec Consulting, LLC ("M&M") is the owner and assignee of the '629 Patent and possesses the full and exclusive right to sue and recover damages for infringement thereof, including past, present, and ongoing acts of infringement. [Id. ¶ 25].[4]

Plaintiff MSTM, LLC ("MSTM") is the owner and assignee of the '458, '838, '648, and '909 Patents and possesses the full and exclusive right to sue for and recover damages arising from any infringement, including past, present, and ongoing acts. [Id. ¶¶ 26–29].[5]

The '973, '096, and '894 Patents (collectively, the "Licensed Patents") have been assigned to the University of the Sciences ("USciences") and Wayne State University (collectively, the "Universities"). [Id. ¶ 33]. Pursuant to an exclusive worldwide license agreement between the Universities and MSTM, the Universities granted MSTM all substantial rights in the Licensed Patents, including the exclusive right to enforce, license, and recover damages for infringement thereof, whether past, present, or future. [Id. ¶¶ 30–32 (citing Ex. G)]. On December 12, 2022, and January 13, 2023, respectively, USciences and Wayne State formally acknowledged and consented to MSTM's exclusive right to assert and enforce the Licensed Patents against Defendant Waters Corporation. [Id. ¶ 33].

Dr. McEwen founded M&M with his co-inventor, Dr. Richard McKay. [Id. ¶ 35]. M&M markets and sells the ASAP Probe technology, and MSTM serves as a distributor of the ASAP Probe. [Id.]

---

[4] Plaintiff M&M was co-founded by Drs. Charles McEwen and Richard McKay. [Am. Compl. ¶ 3].
[5] Plaintiff MSTM was founded by Drs. Charles McEwen and Sarah Trimpin. Currently, Dr. McEwen serves as the President of MSTM and Dr. Trimpin is the Chief Executive Officer. [Am. Compl. ¶¶ 4, 6–7.

### i.     **Defendant Waters Corporation**

On June 1, 2008, Micromass Ltd. UK ("Micromass"), a wholly owned subsidiary of Waters Corporation ("Waters"), obtained a nonexclusive license to the '629 Patent pursuant to the ASAP License Agreement. [Id. ¶ 38]. After Waters obtained its license, it frequently promoted, and supported various technological advancements put forth by the Plaintiffs. [Id. ¶¶ 39, 42–43, 50–51]. In 2013, Waters submitted a letter supporting an NSF STTR[6] proposal by Drs. Trimpin and McEwen, stating that the ASAP Probe is a widely used accessory for Waters' mass spectrometers and "the single best-selling accessory in Waters' history." [Id. ¶¶ 42–43]. Additionally, Waters has referenced and promoted the ASAP technology developed by Dr. McEwen and M&M. [Id. ¶¶ 50–51]. In 2020, Waters introduced the RADIAN™ ASAP System, a direct mass detector that utilizes the ASAP technology embodied in the '629 Patent. [Id. ¶ 53]. Waters marketed the RADIAN ASAP as a standalone system designed for rapid analysis of solids and liquids with minimal sample preparation. [Id.]

### C.  **Breach of Contract**

#### i.     *Confidentiality agreements*

Beginning in 2010, Waters initiated a series of confidentiality agreements with Plaintiffs. Between 2010 and 2018, Waters and its subsidiaries executed multiple nondisclosure agreements ("NDAs") with Drs. Trimpin and McEwen, MSTM, and their institutions, Wayne State University

---

[6] MSTM received support from the National Science Foundation ("NSF") through its Phase I, Phase II, and Technology Enhancement for Commercial Partnership ("TECP") awards to advance and commercialize its mass spectrometry ionization technologies. [Id. ¶ 60]. The NSF's Small Business Innovation Research ("SBIR") and Small Business Technology Transfer ("STTR") programs provide TECP supplemental funding opportunities to assist Phase II awardees, such as MSTM, in commercializing their technologies. [Id. ¶ 61].

and USciences. [Id. ¶¶ 11, 70, 110, 219]. Under the first of these agreements, executed with Wayne State on July 14, 2010, Dr. Trimpin disclosed confidential information regarding laserspray inlet ionization and related proprietary methods. [Id. ¶ 72].

Waters' engagement deepened in early 2011, when its Senior Product Manager, Ronan O'Malley, wrote to Dr. Trimpin expressing Waters' interest in her ionization research and its applicability to biomolecular and chemical analysis. [Id. ¶¶ 75–76]. In August 2011, Dr. Trimpin provided Waters with additional confidential and unpublished information concerning inlet ionization innovations and patent applications, and in September 2011, Waters invited her to participate in its Centers of Innovation ("COI") Program, issuing a COI Letter of Understanding outlining confidentiality obligations. [Id. ¶¶ 77, 80].

Waters also sought access to Dr. McEwen's work. [Id. ¶ 85]. On November 1, 2011, it executed a mutual NDA with USciences to evaluate a potential research collaboration with Dr. McEwen's laboratory and subsequently entered into a separate NDA directly with MSTM. [Id. ¶¶ 85, 92]. Through these agreements, Waters obtained copies of unpublished patent applications later issued as the '458, '648, and '909 Patents. [See id. ¶¶ 93–94]. Over the years that followed, Waters continued to engage directly with Plaintiffs' research. [Id. ¶¶ 10, 70, 73, 75, 96, 97, 100, 105, 109, 118, 119, 124]. From 2011 through 2019, Waters' executives and researchers made visits to MSTM's laboratories to observe and discuss the company's ionization technologies and evaluate licensing opportunities related to the '973, '096, and '458 Patents. [Id. ¶¶ 100, 124].

Between 2011 and 2022, Waters also repeatedly expressed formal interest in MSTM's innovations through letters supporting various NSF and National Institutes of Health ("NIH") proposals. [Id. ¶¶ 10, 70, 73, 75, 96, 97, 105, 109, 118, 119]. These letters recognized MSTM's

new ionization technologies, praised their potential impact in mass spectrometry, and acknowledged Waters' ongoing interest in their commercial development. [Id.]

      ii.    *ASAP Agreement*[7]

Waters and its subsidiary, Micromass, obtained a non-exclusive license to the '629 Patent (The "ASAP Agreement") with M&M, which governs the licensed patent, royalty payments, and related obligations. [Id. ¶ 38]. This agreement between the parties applies to the '629 Patent as well as any improvements elected by Micromass, all future related patent applications, any reissues or extensions of the patents, and all foreign patent applications or corresponding patents. [Id. ¶ 132]. Under section 3(b) of the Agreement, Waters is required to pay a royalty of $250 per ASAP Probe that embodies one or more claims of the licensed patent sold in jurisdictions where a valid licensed patent is issued. [Id. ¶ 133]. Waters' RADIAN ASAP device embodies one or more claims of the '629 Patent and owes M&M royalties from the sale or distribution of the device. [Id. ¶ 137]. Waters subsequently distributed ASAP Probes and the RADIAN ASAP and paid quarterly royalties to M&M for the products sold and distributed. [Id. ¶¶ 135–36].

      iii.    *Termination of ASAP Agreement*

On March 10, 2023, M&M notified Waters of an alleged breach of the ASAP Agreement through personal delivery of the original complaint. [Id. ¶ 140]. Waters subsequently engaged with Plaintiff regarding the complaint, including a meet and confer on March 16, 2023, and proposed a

---

[7] The Court may consider certain documents the authenticity of which are not disputed by the parties, official public records, documents central to Plaintiffs' claim, and documents sufficiently referred to in the complaint. Watterson v. Page, 987 F.2d 1, 3–4 (1st Cir. 1993) (collecting cases). The ASAP Agreement referenced throughout and attached to the Amended Complaint, is central to the Plaintiffs' claims and its authenticity is not in dispute by the parties. Accordingly, the Court may review the filing at this stage of the litigation. [ECF No. 26-10, hereinafter "ASAP Agreement"].

follow-up meeting to review sales and accounting documentation, which did not occur. [Id. ¶¶ 141–43]. Prior to the proposed follow up meeting, on May 1, 2023, Waters filed a motion to dismiss Plaintiffs' initial complaint, citing lack of notice or opportunity to cure the alleged breach. [Id. ¶ 144]. On May 2, 2023, M&M communicated to Waters' counsel that the ASAP Agreement was terminated, and that Waters was no longer a valid licensee of the '629 Patent. [Id. ¶¶ 145–46].

### D. **Patent Infringement**

#### i. *Actual Knowledge of Patents-in-Suit*

Plaintiffs assert in the Amended Complaint that Waters not only had actual knowledge of the Patents-in-Suit but also had actual knowledge of the patent applications that led to the issuance of the Patents-in-Suit prior to the filing of Plaintiffs' initial complaint on March 8, 2023.[8] [Id. ¶ 174]. For over a decade, Waters received information about the patents through nondisclosure agreements, confidential communications, joint evaluations of the technology, materials Plaintiffs provided about pending applications, and its own statements describing how Plaintiffs' ionization technologies related to its mass-spectrometry instruments. [Id. ¶¶ 175, 206, 216, 223].

#### a. *Patents '973, '096, and '894*

Around April 20, 2011, Drs. McEwen and Trimpin had dinner with executives from Waters, including Michael Balogh (Director, Strategic Collaborations, Waters), during which they discussed the parent patent application for the '973, '096, and '894 Patents. [Id. ¶ 176]. Following the meeting, Dr. McEwen sent an email to Mr. Balogh summarizing the discussion regarding the patents and cooperative agreements between the universities. [Id. (citing Ex. K)].

---

[8] Waters does not dispute actual knowledge of the '629 Patent, but does dispute actual knowledge of the other seven patents at issue in this case. [ECF No. 29 at 17–18].

On September 9, 2011, Dr. Lori Simoes of Wayne State University emailed Balogh and Ronan O'Malley (Waters), attaching patent application PCT/US2011/050150, filed September 1, 2011, which combined three of Plaintiffs' ionization provisional patents and is identified on the front pages of the '973, '096, and '894 Patents, along with an Excel spreadsheet summarizing Dr. Trimpin's patent applications. [Id. ¶¶ 177–79 (citing Ex. L)].

While Waters evaluated licensing of these patents, Jeff Brown (Senior Research Scientist, Waters) filed provisional patent application No. 61/556,484 on November 4, 2011, and application No. 14/355,848 on April 23, 2014, which ultimately led to U.S. Patent No. 9,105,455. [Id. ¶ 180]. From 2013 through at least 2019, Brown visited Plaintiffs' laboratories to observe and gather information about their proprietary ionization technologies. [Id. ¶ 181]. In the U.S. Patent No. 9,105,455 filing, the patent office examiner cited Plaintiffs' U.S. Publication No. US/2013/0214154 as a prior art. [Id. ¶ 182].

### b. Patent '458, '838, '648

Similarly, while evaluating licensing of the '458 Patent, Jeff Brown and Martin Green (Consultant Research Scientist, Waters) filed PCT/GB2015/052264 and U.S. Patent Application No. 15/501,599, which later issued as U.S. Patent No. 10,319,575. [Id. ¶¶ 185–87]. During prosecution, the '458 Patent appeared as a prior art reference. [Id. ¶ 187; ECF No. 29 at 15 ("[T]he patent was cited to the Patent Office by outside prosecution counsel, not by Waters itself.")]. In the same period, 2013 through at least 2019, Brown and Green made regular visits to Plaintiffs' laboratories to gather information relevant to Waters' assessment of a potential license to the '458 Patent. [Id. ¶ 186]. Continuation applications related to the '458 Patent were filed around June 2015, ultimately resulting in the issuance of the '838 Patent, and a related continuation led to the '648 Patent, which was disclosed to Waters at least by October 2020. [Id. ¶¶ 188–89].

### c.  Patent '909

Around 2015, MSTM disclosed information to Waters about the '909 Patent and its related applications, including provisional application No. 62/012,207. [Id. ¶ 191]. Waters' exposure included the content of the provisional application as well as the subsequently issued patent. [Id.]

Waters' exposure to the Patents-in-Suit, specifically '909, '838, '648, and '458, included its executives' firsthand involvement and its dissemination of materials referencing the patented technologies, including offering to customers the publication Matrix Assisted Ionization Vacuum (MAIV), a New Ionization Method for Biological Materials Analysis Using Mass Spectrometry, Molecular & Cellular Proteomics (2013), [Id. ¶ 193], and presentations by Drs. McEwen and Trimpin, distributed by Waters after March 2013. [Id. ¶ 194].

## II.    **PROCEDURAL HISTORY**

On March 8, 2023, Plaintiffs filed their original complaint. [ECF No. 1]. On May 1, 2023, Defendant filed a motion to dismiss for failure to state a claim. [ECF No. 20]. On May 15, 2023, Plaintiffs filed their amended complaint, [ECF No. 26], and Defendant filed a motion to dismiss the amended complaint for failure to state a claim within the same month, [ECF No. 27].

On June 13, 2023, Plaintiffs filed their opposition to Defendant's motion to dismiss, [ECF No. 35], and Defendant filed its response on June 28, 2023. [ECF No. 40]. Plaintiffs filed a sur-reply on July 3, 2023. [ECF No. 41].

A hearing on the motion to dismiss was held on January 10, 2024. [ECF No. 53]. This Court entered an electronic order on September 30, 2024, **DENYING** Defendant's motion to dismiss. [ECF Nos. 27, 66].

### III.    <u>LEGAL STANDARD</u>

A complaint "must provide 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" <u>Cardigan Mountain Sch. v. N.H. Ins. Co.</u>, 787 F.3d 82, 84 (1st Cir. 2015) (quoting Fed. R. Civ. P. 8(a)(2)). To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)). At the pleading stage, a plaintiff need not demonstrate that they are likely to prevail, but "[their] claim must suggest 'more than a sheer possibility that a defendant has acted unlawfully.'" <u>García-Catalán v. United States</u>, 734 F.3d 100, 102–03 (1st Cir. 2013) (quoting <u>Iqbal</u>, 556 U.S. at 678).

On a motion to dismiss made pursuant to Rule 12(b)(6), the factual allegations in the complaint are accepted as true, and the Court draws "all reasonable inferences in favor of the plaintiff." <u>Trans-Spec Truck Serv., Inc. v. Caterpillar Inc.</u>, 524 F.3d 315, 320 (1st Cir. 2008) (citing <u>Garita Hotel Ltd. P'ship v. Ponce Fed. Bank, F.S.B.</u>, 958 F.2d 15, 17 (1st Cir. 1992)). The plausibility standard does not impose a probability requirement; it requires only enough facts to allow the Court to reasonably infer liability. <u>Iqbal</u>, 556 U.S. at 678; <u>Twombly</u>, 550 U.S. at 556.

The Federal Circuit has made clear that in patent infringement cases, a plaintiff is not required to plead infringement on an element-by-element basis, and courts may not impose such a blanket requirement. <u>Bot M8 LLC v. Sony Corp. of Am.</u>, 4 F.4th 1342, 1352 (Fed. Cir. 2021). The level of detail required in any given case will vary depending upon several factors, including the complexity of the technology, the materiality of any given element to practicing the asserted claims, and the nature of the allegedly infringing device. <u>Id.</u> at 1353.

## IV.    <u>DISCUSSION</u>

Defendant Waters filed its motion to dismiss arguing several theories, including, that Plaintiffs failed to give Waters a reasonable opportunity to cure any alleged breach of its ASAP agreement, that Waters was the rightful licensee of the '629 patent and therefore cannot infringe, and that the complaint was insufficiently pleaded to assert direct and indirect infringement causes of action.[9] [ECF Nos. 27, 28]. Plaintiffs oppose this motion, asserting that the Amended Complaint "surpasses the 'short and plain statement'" threshold required for the Court's analysis at the motion to dismiss stage under Fed. R. Civ. P. 8, and that the significant history between the parties, as detailed in the Amended Complaint, is sufficient to assert pre-suit knowledge of the patents. [ECF No. 35].

### A.  COUNTS I-II: CONTRACT CAUSES OF ACTION

Plaintiffs bring two contract causes of action. Plaintiffs allege that Waters "withheld considerable royalties to M&M" related to the Waters' mass spectrometry devices which were developed under the license agreement for M&M's patented technology. [Am. Compl. ¶ 134]. Plaintiffs do not allege specific sales or customers relevant to this assertion but generally allege that Waters was outspoken about the success of their ASAP probes as their "single-best-selling" accessory in the company's history, and the royalty-payments made to M&M do not reflect the success of these products. [See Am. Compl. ¶¶ 133–35; see Tr. 18:8–15]. Although the general allegation of failure to pay royalties underpins both Count I and Count II, arguments made within

---

[9] To avoid confusion, the Court uses "cause of action" when referring to Plaintiff's allegations and uses "claim" in the patent sense. The term "claim" in the patent context holds a dual meaning. "Claim" might refer to a "cause of action," or it might refer to the portion of a patent that follows the patent's specification and defines the scope of the patentee's monopoly. <u>Senju Pharm. Co. v. Apotex Inc.</u>, 746 F.3d 1344, 1349 (Fed. Cir. 2014).

the pleadings and at the hearing have persuaded the Court that the claims are distinct and have been pleaded with sufficient plausibility to overcome the threat of a 12(b)(6) dismissal.

> ### i.    Count I: Breach of Contract

Under Massachusetts law, a breach-of-contract claim requires the plaintiff to show: (1) the existence of an agreement supported by consideration; (2) the plaintiff's performance; (3) the defendant's breach; and (4) resulting damages. Unum Grp. v. Benefit P'ship, Inc., 938 F. Supp. 2d 177, 185 (D. Mass. 2013). The implied covenant of good faith and fair dealing cannot create rights beyond those in the contract and provides no independent basis for recovery absent a willful and malicious refusal to perform an express contractual obligation. Eigerman v. Putnam Invs., Inc., 877, N.E.2d 1258, 1265 (Mass. 2007); Edlow v. RBW, LLC, 688 F.3d 26, 35–36 (1st Cir. 2012).

There is no contest that a contract was operative between the parties prior to the alleged breach and, if a breach did occur, there would be resulting financial harm to the Plaintiffs. Defendant moves to dismiss the contract claims in full, largely focusing its argument as to Count I on the issue of proper notice of the alleged breach and the right to cure as outlined by the parties' ASAP Agreement. [ECF No. 29 at 16–20]. Plaintiffs argue that the ASAP agreement contains no condition precedent on a breach of contract action, and that the Defendant's reliance on the Agreement is misplaced because it only establishes the expectations for *termination.* [ECF No. 35 at 21].

> 4. Term, Notice and Termination.
> (a) The Services shall begin on June 1, 2008 and shall continue until May 31, 2009 unless terminated earlier in accordance with the provisions of this Agreement.
> (b) The license and royalty payment obligations under Section 3 above are perpetual until the last Licensed Patent expires, unless this Agreement is earlier terminated pursuant to Section 4(c) below.
> (c) This Agreement **may be terminated by either party in the event of a breach of this Agreement by the other party, upon notice and reasonable opportunity (not to exceed thirty days) to cure**. Termination

of this Agreement does not relieve Consultant of obligations under Sections 6, 7 and 8.

[ASAP Agreement, ECF No. 26-10 at 3] (emphasis added).

The parties agree that notice occurred with the personal delivery of the original complaint on March 10, 2023, and that the Court summons was returned as executed by Waters establishing service on the same day. [ECF No. 7]. The formal termination of the agreement did not occur until May 2, 2023, after the parties held a meet-and-confer to discuss the allegations of the breach of contract, and the Defendant filed its motion to dismiss.[10] [ECF No. 26].

The Court agrees with Defendant that requirements for notification of termination must be strictly construed. [ECF No. 29 at 17]. Under the canons of contract interpretation, "contracts containing unambiguous language must be construed according to their plain and natural meaning." Smart v. Gillette Co. Long-Term Disability Plan, 70 F.3d 173, 178 (1st Cir. 1995). "Contract language is ambiguous where the phraseology can support a reasonable difference of opinion as to the meaning of the words employed and the obligations undertaken." Bank v. Thermo Elemental Inc., 888 N.E.2d 897, 907 (Mass. 2008). Words that are "plain and free from ambiguity" must be understood in their "usual and ordinary sense," and a contract should be interpreted "in a reasonable and practical way, consistent with its language, background, and purpose." Bukuras v. Mueller Grp., LLC, 592 F.3d 255, 262 (1st Cir. 2010) (quotations omitted). "[A]bsent ambiguous provisions, we look solely to the language of the contract and do not consider extrinsic evidence." NTV Mgmt., Inc. v. Lightship Glob. Ventures, LLC, 140 N.E. 436, 443 (2020). "A contract is not ambiguous simply because litigants disagree about its proper interpretation." Weiss v. DHL Express, Inc., 718 F.3d 39, 45 (1st Cir. 2013).

---

[10] Instead of staying or continuing the dispute to resolve the issue amongst themselves, Waters forwent the proposed meet and confer and filed their initial Motion to Dismiss, [ECF No. 20], on May 1, 2023; Plaintiffs then sent the formal termination letter for the ASAP Agreement. [Am. Compl. ¶¶ 142–46].

The language of section 4(c) is clear and unambiguous.  The ASAP Agreement, § 4 outlines the agreement for *termination* not for a breach of contract action, and explicitly states that the agreement, "may be terminated by either party in the event of a breach of this agreement by the other party, upon notice and reasonable opportunity (not to exceed thirty days) to cure." ASAP Agreement, § 4(c). The difference in time between initial service of the complaint, March 10 and the *termination* of the ASAP agreement, May 2, 2023, represents a total of fifty-three days. The contract afforded the parties a window of thirty days between the notice and a reasonably opportunity to cure. ASAP Agreement, § 4(c).  Fifty-three days is beyond the window of the notice and reasonable opportunity requirement set by the parties.

Defendant also argues that the ASAP Agreement was not properly terminated because Plaintiffs were not within their rights under the contract to terminate the agreement unilaterally. [ECF No. 29 at 18]. Once more, the Court looks to the plain language of the contract which outlines that *either party* may terminate the agreement. ASAP Agreement, § 4(c). There is no express or ambiguous language articulating that the parties must agree to terminate the contract between them. Therefore, the argument that the unilateral termination of the agreement, without support from incorporated agreements or prior acts, does not persuade the Court to bar Plaintiffs' pending claims at the motion to dismiss stage.

Defendants argue in the alternative, in their briefing and at oral argument, that the Plaintiffs have not outlined specific instances where Waters allegedly sold the ASAP Probe in violation of the contractual terms, and therefore, have not given Waters the "details necessary . . . to investigate the royalty issues" and give a reasonable opportunity to cure the alleged breach. [ECF No. 29 at 17–18; Tr. 13:17–14:04, 27:16–22]. Plaintiffs counter that the internal marketing and sales of the ASAP Probe, including the customers and dates, are beyond the scope of the information available

to them prior to discovery, and that the allegation is a more general assertion that the royalties received by M&M do not appropriately reflect Waters' "single-best-selling" accessory in the company's history. [See Am. Compl. ¶133–35; see Tr. 18:08–15].

In accepting all facts in the complaint as true and drawing all inferences in favor of the Plaintiff, Plaintiffs have met their burden in alleging (1) the parties had an agreement supported by consideration (the ASAP Agreement); (2) Plaintiff's performance; (3) Waters' alleged breach in failing to pay full royalties to MSTM; and (4) resulting damages in the unpaid royalties. See Unum Grp., 938 F. Supp. 2d at 185. The Court finds that the Plaintiffs have asserted enough information to support their claims at the motion to dismiss stage and that the allegations, taken as a whole, meet the necessary threshold for the plausibility standard. Therefore, the Motion to Dismiss, [ECF No. 27], as to Count I is **DENIED**.

i.    *Count II: Implied Covenant of Good Faith and Fair Dealing*

In Massachusetts, the covenant of good faith and fair dealing is implied in every contract. Kerrigan v. Boston, 278 N.E.2d 387, 393 (Mass. 1972), quoting Clark v. State St. Trust Co., 169 N.E. 897, 903 (Mass. 1930). The covenant ensures, "'that neither party interferes with the ability of the other to enjoy the fruits of the contract' and that 'when performing the obligations of the contract, the parties remain faithful to the intended and agreed expectations of the contract.'" FAMM Steel, Inc. v. Sovereign Bank, 571 F.3d 93, 100 (1st Cir. 2009) (quoting Chokel v. Genzyme Corp., 867 N.E.2d 325, 329 (2007)). "The requirement of good faith performance is, however, circumscribed by the obligations in the contract." Speakman v. Allmerica Fin. Life Ins., 367 F. Supp. 2d 122, 132 (D. Mass. 2005) (citing AccuSoft Corp. v. Palo, 237 F.3d 31, 45 (1st Cir. 2001)). The covenant may not, however, be invoked to create rights and duties not otherwise provided for in the existing contractual relationship, as the purpose of the covenant is to guarantee

that the parties remain faithful to the intended and agreed expectations of the parties in their performance. See Cadle Co. v. Vargas, 771 N.E.2d 179, 183 (Mass. App. Ct. 2002); Restatement (Second) of Contracts § 205 (1979).

Defendant argues that Count II must be dismissed because the two contract claims arise from the same set of facts and are therefore duplicative. [ECF No. 29 at 19]. While there is general overlap between the breach of contract cause of action and the breach of implied covenant of good faith and fair dealing cause of action, they are not identical. To the extent that the implied covenant and the breach of contract have similar facts underlying the two causes of action, the Court has no duty at this stage to determine whether the claims can be distinguished despite this overlap or dismiss the implied covenant claim as duplicative. See Duncan v. Nissan N. Am., Inc., 305 F. Supp. 3d 311, 322 (D. Mass. 2018) ("At the pleading stage, however, mere redundancy between two separate counts is not a sufficient reason to dismiss a count of the complaint." (citation omitted)). To pursue an implied covenant theory, a plaintiff must make "additional factual allegations" that support the claim that defendants' failure to perform exhibited a lack of good faith. Christensen v. Kingston Sch. Comm., 360 F.Supp.2d 212, 229 (D. Mass. 2005) (internal quotations omitted). To succeed on a claim for breach of implied covenant of good faith and fair dealing, "[t]he plaintiff need not prove that there was bad faith but rather must only prove a lack of good faith which can be inferred from the totality of the circumstances." Hopkinton Friendly Serv., Inc. v. Glob. Co. LLC, 384 F. Supp. 3d 179, 188 (D. Mass. 2019) (citing A.L. Prime Energy Consultant, Inc. v. Mass. Bay Transp. Auth., 95 N.E.3d 547, 560 (2018)); see also Nile v. Nile, 734 N.2d 1153, 1160 (Mass. 2013) ("showing a lack of good faith is required in these circumstances, but it may be inferred by evidence.").

Under section three of the ASAP Agreement, Waters is licensed to "make, have made, use, sell and have sold products and services practicing one or more of the claims described in the 'Licensed Patents,'" and in return, Waters and its subsidiaries are required to pay a quarterly royalty to M&M for each ASAP Probe that practices one or more of the claims of the licensed patents that Waters, or Micromass, "sells in the jurisdictions in which a then valid Licensed Patent is issued." ASAP Agreement, § 3(a)-(c); [Am. Compl. ¶ 154].

Plaintiffs present three distinct actions of Waters' purported bad faith related to the ASAP agreement, which Plaintiffs argue constitute a breach the implied covenant of good faith and fair dealing.  First, Plaintiffs allege that Waters provided ASAP Probes for free to customers and third parties which use Waters' mass spectrometry devices to evade the necessary royalties due for *sales* of the ASAP Probe. [Am. Compl. ¶¶ 135, 155; <u>see</u> Tr. 24:10–21].  Second, Plaintiffs allege that Defendants intentionally circumvented the ASAP Agreement royalty provision by selling the ASAP Probe to Waters' wholly-owned subsidiaries located outside of the United States, where the patent protections do not apply, and then those subsidiaries regularly sold and distributed the Probes back on the American market without compensating M&M. [Am. Compl. ¶¶ 156–58]. Defendant conceded at oral argument that Waters does not pay royalties for sales made outside of the United States, because the contract only requires sales in the United States. Therefore, any allegation of failure to pay royalties on these sales is beyond the scope of the ASAP agreement and expands the duties of Waters not considered under their contract. [Tr. 14:13–21].

Finally, Plaintiffs allege that the Defendants have violated the implied covenant because it did not name the M&M inventors Drs. McEwen and McKay as co-inventors on the later developed Waters products, namely the RADIAN ASAP device, and failed to cite their patented work as prior art. [Am. Compl. ¶¶ 160–69; Tr. 12:22–15:09]. Under the ASAP agreement, Waters is obligated

to pay royalties for each ASAP Probe that practices one or more of the claims described in the licensed patents that claim priority to subject matter disclosed or claimed in the patent application which led to the '629 Patent. [Am. Compl. ¶ 160]. It is asserted that Waters developed RADIAN ASAP, based on the ASAP patented technology without notifying M&M. [Id. ¶ 169]. The Amended Complaint asserts that following the execution of the Agreement, Waters filed patent applications claiming improvements to the '629 Patent without notifying M&M or naming Drs. McEwen or McKay as co-inventors, including U.S. Patent No. 8,384,026 (the "Waters '026 Patent"), without claiming priority to the '629 Patent. [Id. ¶¶ 161–63]. Prior to filing, Micromass had access to M&M's unpublished patent application, and the Waters '026 Patent cites multiple publications by Dr. McEwen describing M&M's ASAP Probe technology. [Id. ¶¶ 164–65]. Plaintiffs argue that this failure to name Drs. McEwen and McKay as co-inventors, or the '629 Patent as a prior art was a violation of the Duty of Disclosure, Candor, and Good Faith requirements of the USPTO pursuant to 37 C.F.R. §1.56, and was done to intentionally avoid paying M&M royalties for the life of the Waters '026 Patent which expires after the '629 Patent. [Id. ¶¶ 162, 167–68].

In response to these allegations, Defendant argues that Plaintiffs are attempting to rewrite the obligations of Waters under the ASAP Agreement or impose new ones that conflict with the plain language of the agreement. [ECF No. 29 at 19]. Specifically, Defendant argues that the license agreement contemplates notification to M&M when *Micromass* elects to claim priority to subject matter disclosed or claimed in Plaintiffs' patent application, the agreement is silent regarding notification obligations on *Waters*, and Plaintiffs failed to pursue a license right to Waters' patents. [ECF No. 29 at 20].

Under Massachusetts law, it is "unclear whether specific intent is required" for a claim of breach of implied covenant of good faith and fair dealing, however, "[e]stablishing a violation of the covenant . . . requires at least bad faith conduct." Sonoran Scanners Inc. v. Perkinelmer, Inc., 585 F.3d 535, 541 (1st Cir. 2009) (citing cases). In the years since Sonoran was decided in the First Circuit, the Massachusetts Supreme Judicial Court has clarified Plaintiffs' burden on this point: "[t]here is no requirement that bad faith be shown; instead, the plaintiff has the burden of proving a lack of good faith . . . [which] can be inferred from the totality of the circumstances." A.L. Prime Energy Consultant, Inc. v. Mass. Bay Transp. Auth., 95 N.E.3d 547, 560 (Mass. 2018) (quoting Robert & Ardis James Found. v. Meyers, 48 N.E.3d 442, 450 (Mass. 2016); Hopkinton Friendly Serv., Inc. v. Glob. Cos. LLC, 384 F. Supp. 3d 179, 188 (D. Mass. 2019) ("The plaintiff need not prove that there was bad faith but rather must only prove a lack of good faith which can be inferred from the totality of the circumstances." (citing A.L. Prime, 95 N.E.3d at 560)). The absence of good faith in the execution of a contract, "'carries an implication of a dishonest purpose, conscious doing of wrong, or breach of duty through motive of self-interest or ill will.'" Young v. Wells Fargo Bank, N.A., 717 F.3d 224, 238 (1st Cir. 2013) (citing Hartford Accident & Indem. Co. v. Millis Roofing & Sheet Metal, Inc. 418 N.E.2d 645, 647 (1981)). Ultimately, "the core question remains whether the alleged conduct was motivated by a desire to gain an unfair advantage or otherwise had the effect of injuring the other party's rights to the fruits of the contract." Id.

As pleaded, the Court finds the facts alleged to sufficiently support Plaintiffs' claims of breach of implied covenant of good faith and fair dealing. Plaintiffs' three examples of Waters' purported bad faith conduct does, at a minimum, raise an inference of a lack of good faith. However, if after discovery, there is no evidence of "deceptive or unfair behavior," and Plaintiffs

can only prove a breach of contract, then defendants may renew their argument regarding duplicity in the contract claims. See Christensen, 360 F.Supp.at 226; see also Boston Pilots v. Motor Vessels Midnight Gambler and E. Coast Excursions, Inc., 357 F.3d 129, 135 (1st Cir. 2004).

At the current stage, the Court finds that the Plaintiffs have met the necessary threshold for the plausibility standard. Fed. R. Civ. P. 12(b)(6). Therefore, the Motion to Dismiss as to Count II is **DENIED.**

### B. **PATENT INFRINGEMENT CLAIMS (COUNTS III-X)**

#### i. *Count III: Patent Infringement as to '629 Patent*

The causes of action for breach of contract are intertwined with the patent infringement allegations as to the '629 Patent. The license agreement at issue was drafted to allow Waters to incorporate the '629 Patent into their mass spectrometry products. [Am. Compl. ¶¶ 34, 38, 59]. Plaintiffs allege that the ASAP Agreement, which granted Waters a license in patented technology, was terminated on May 2, 2023, nevertheless, Waters and its subsidiaries continued to make and distribute the licensed products after the termination of the license agreement. [Id. ¶¶ 140–46, 196–98, 204–10]. Defendants counter that Plaintiffs' unilateral attempt to terminate the license agreement was ineffective under the agreement's own terms, therefore, the license was not nullified, and the Defendants remain properly licensed to the '629 Patent. [ECF No. 29 at 12]. It continues that because the Defendant was properly licensed, it cannot infringe on the '629 Patent and Count III must be dismissed. [Id.]

As previously discussed, *supra* Section IV.A.i, there is nothing in the plain language of the ASAP agreement which prevents a party from unilaterally terminating the agreement. As the contract claims are still pending, the Court will **DENY** the motion to dismiss as to Count III.

ii.    *Counts IV-X: Direct Infringement of Patents '973, '096, '894, '458, '909, '838, '648.*

Plaintiffs assert that the ASAP Agreement granted Waters and its subsidiary Micromass a non-exclusive license to the '629 Patent, [Am. Compl. ¶¶ 38, 132–33, 139], which terminated following an alleged breach by Waters, [Id. ¶¶ 140–46]. After Plaintiffs' termination, Waters maintained its activities involving the RADIAN ASAP and other mass spectrometry products that embody claims of the '629 Patent. [Id. ¶¶ 209–10]. The Amended Complaint alleges that Waters' mass spectrometry devices, such as SELECT SERIES Cyclic IMS, SYNAPT XS, Vion IMS, Xevo TQMQ, Xevo TQ-S, Acquity QDa, Rapid Evaporative Ionization Mass Spectrometry ("REIMS"), REIMS with iKnife, and UniSpray source, collectively "Waters' MS Devices," implement one or more claims of the '973, '096, '894, '458, '909, '838, '648 Patents. [Id. ¶¶ 214, 224, 234, 244, 254, 264, 274 (citing Ex. N; Ex. O; Ex. P; Ex. Q; Ex. R; Ex. S; Ex. T)]. In support thereof, Plaintiffs attach charts that identify the Waters' products for each patents-in-suit and include an element-by-element analysis comparing the Waters product to the claim asserted in the Amended Complaint. [Id.] Waters' alleged activities include: offering, selling, and importing these products, including instructions, demonstrations, manuals, and educational resources, associated with them. [Id. ¶¶ 204–08 (citing Ex. M)]. Plaintiffs argue that these activities were conducted without a license or rights from MSTM to practice any claims of the Patents-in-Suit. [Id. ¶¶ 195–97].

Waters argues that Plaintiffs fail to state a proper claim of direct infringement for the seven Patents-in-Suit because Plaintiffs use a "mix-and-match approach for the accused products," asserting, "without distinction between apparatus and method claims," and that the Plaintiffs fail to show that "each product includes all elements of at least one claim." [ECF No. 29 at 7, 13].

Direct patent infringement occurs when "whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States . . . during the term of the patent therefore." 35 U.S.C. § 271(a). For direct infringement under 35 U.S.C. § 271(a), a plaintiff must allege that the accused product or method practices all limitations of at least one asserted claim, and where method claims are involved, that all steps are performed by or attributable to a single entity. Sunrise Techs., Inc. v. Cimcon Lighting, Inc., 219 F. Supp. 3d 260, 263 (D. Mass. 2016); Rampage LLC v. Global Graphics SE, 2017 WL 239328, at *3 (D. Mass. Jan. 19, 2017). A party cannot infringe a patent under which it holds a license. Intel Corp. v. VIA Techs., Inc., 319 F.3d 1357, 1364 (Fed. Cir. 2003).

In addition to its arguments in the memorandum of support for the motion to dismiss, [ECF No. 29], Defendants implore this Court to rely on the supplemental authority of CTD Networks, LLC v. Google LLC, where a Texas district court found that a "mix and match" pleading was insufficient to state a claim for system infringement. 688 F. Supp. 3d 490 (W.D. Tex. Aug. 22, 2023); [ECF No. 44]. In CTD Networks, the Court rejected the Plaintiffs' Second Amended Complaint because the Plaintiffs alleged a *combination theory* of infringement, where a suite of products in combination, infringed on the Plaintiff's patented system. CTD Networks, 688 F.Supp.3d at 499-501. Judge Rodriguez noted that, "marketing material indicating the products are sold together is insufficient to establish product integration as a single infringing system." Id. (citing AK Meeting IP LLC v. Zoho Zorp., No. 1:22-cv-1165-LY, 2023 WL 1787303, at *4 (W.D. Tex. Feb. 6, 2023)). This aligns with precedent in this Circuit, where a plaintiff has the burden to allege that the infringement is "attributable to a single entity." Sunrise Techs., Inc., 219 F. Supp. 3d at 263.

The case before this Court is distinguishable from CTD Networks, and the argument that the CTD Networks holding bars the Plaintiffs' current action is unpersuasive. Plaintiffs in this case do not present a *combination theory* in their infringement claims, nor are they bringing a claim for system infringement. Plaintiffs allege that the Waters' products at issue *each* infringe on the method or apparatus of one of the seven Patents-in-Suit, pairing the allegations with detailed claim charts "showing the types of hardware in the accused products that would meet the claim elements showing that infringement is more than plausible." [Am. Compl. at 6–7, 11–14; ECF No. 45 at 2 (citing AnywhereCommerce, Inc., v. Ingenico, Inc., 517 F. Supp. 3d 45, 53–54 (D. Mass. 2021))]. Precedent in the First and Federal Circuits does not necessitate that a plaintiff plead infringement on an element-by-element basis at the motion to dismiss stage, and courts may not impose such a blanket requirement. Bot M8 LLC v. Sony Corp. of Am., 4 F.4th 1342, 1352 (Fed. Cir. 2021). "Instead, it is enough 'that a complaint places the alleged infringer on notice of what activity is being accused of infringement.'" Id. (quotations and alteration omitted) (quoting Lifetime Indus., Inc. v. Trim-Lok, Inc., 869 F.3d 1372, 1379 (Fed. Cir. 2017)).

Here, Plaintiffs have adequately put Waters on notice as to what it must defend. Plaintiffs have identified the specific Patents-in-Suit and the alleged infringing products from Waters, attaching the claim charts to support their claims. At this pleading stage, Plaintiffs are not required to establish their entire case, and the Court must view the facts in light most favorable to the non-moving party, the Plaintiffs. Where Plaintiffs may fall short of an element-by-element infringement presentation, that must be addressed at the subsequent claim construction and Markman hearings later in this litigation.

Accordingly, Waters' motion to dismiss for direct infringement is **<u>DENIED</u>**.

> > *iii.*     *Counts IV-X: Indirect Infringement of Patents, '973, '096, '894, '458, '909,*
> >
> > *'838, '648.*

Defendant contends that Plaintiffs have inadequately pleaded that it had actual pre-suit knowledge of the seven patents-in-suit, excluding the '629 Patent. [ECF No. 29 at 13–16].

A properly pleaded allegation of direct infringement is a threshold requirement for indirect infringement. See In re Bill of Lading Transmission & Processing Sys. Patent Litig., 681 F.3d 1323, 1333 (Fed. Cir. 2012). Knowledge is a required element for both indirect and willful infringement claims. Dynacore Holdings Corp. v. U.S. Philips Corp., 363 F.3d 1263, 1273 (Fed. Cir. 2004); WBIP, LLC v. Kohler Co., 829 F.3d 1317, 1340 (Fed. Cir. 2016) (explaining the importance of "assessing the infringer's knowledge at the time of the challenged conduct"). Knowledge of a patent can be demonstrated by a totality of the circumstances analysis, WCM Indus., Inc. v. IPS Corp., 721 F. App'x 959, 970 (Fed. Cir. 2018), and it can be proven using circumstantial evidence, SiOnyx, LLC v. Hamamatsu Photonics K.K., 330 F. Supp. 3d 574, 608–10 (D. Mass. 2018). In this Circuit, indirect and willful infringement claims require actual, pre-suit knowledge of the patent; the complaint itself cannot supply that knowledge. Canon, Inc. v. Avigilon USA Corp. Inc., 411 F. Supp. 3d 162, 164–66 (D. Mass. 2019). Willful infringement further requires plausible allegations that the defendant knew of the patent and knew of its infringement. Id. at 165.

In addition to the facts presented, *supra* Section IV.D.i, Plaintiffs allege that Waters' actual knowledge of the Patents-in-Suit was further reinforced through Waters' counsel prosecuting Waters' patent families, US 61/556,484; US 14/355,848 (which issued as U.S. Patent No. 9,105,455); PCT GB2015/052264; and US 15/501,599 (which issued as U.S. Patent No. 10,319,575), during which the '973, '096, '894, '458, '838, and '648 Patents were referenced in

the prosecution materials by the USPTO. [Am. Compl. ¶ 190]. Defendant counters that the use of counsel in other litigation is not enough to assert pre-suit knowledge of these patents, and argues that for the '458 Patent specifically, that a citation made by the USPTO during prosecution of the Waters' '575 Patent, does not imply that Waters itself acquired actual notice of the '458 Patent. [ECF No. 29 at 18]. Defendant also argues that the Plaintiffs' allegation that Waters' knowledge of patent *applications* is insufficient to prove that it was aware of the *patent* once registered. [Id. at 19].

The Court agrees that representation by the same external counsel is not necessarily enough to *prove* actual knowledge by a Defendant, however, that is not the standard at a motion to dismiss. After careful review of the filings and argument, the Court determines that there is sufficient information asserted throughout the Amended Complaint to support that Waters and M&M had a long-term professional relationship spanning over the course of a decade. In that relationship, information regarding registered patents, patent applications, and ongoing scientific innovation was shared between the parties under confidential agreements, and Waters' and its subsidiary Micromass, were aware of the patent applications and the technology at issue in this case. [See Am. Compl. ¶¶ 10–11, 25–281]. Plaintiffs note specific interactions with employees of Waters which detail first-hand knowledge of the Patents-in-Suit years prior to litigation. [See *supra*, Section IV.D.i.; see Am. Compl. ¶¶ 173–94]. To suggest that Waters did not have knowledge of this technology after a decade-long relationship relating to licensing this very technology is contrary to substantial allegations presented to the Court in the Amended Complaint.

The Court finds that the Plaintiffs have met the plausibility standard required of a motion to dismiss. The parties may move forward in their claim construction and Markman hearings to further establish the claims at issue in this suit.

## V.    **CONCLUSION**

In accordance with the foregoing, Defendant's Motion to Dismiss, [ECF No. 27], is

**DENIED**.


**SO ORDERED.**

Dated: March 10, 2026

/s/ Margaret R. Guzman
Margaret R. Guzman
United States District Judge
